KELLER ROHRBACK L.L.P.
KEIL M. MUELLER, OSB No. 085535
kmueller@kellerrohrback.com
601 SW Second Avenue, Suite 1900
Portland, OR 97204
Telephone: 971/253-4600

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
bcochran@rgrdlaw.com
FRANCISCO J. MEJIA
fmejia@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

[Additional counsel appear on signature page.]

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

DIVISION PORTLAND

| | |
|---|---|
| CHADWICK P. TRUEDSON, Individually and on Behalf of All Others Similarly Situated, ) ) ) | No. _____ |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | |
| NUSCALE POWER CORPORATION, JOHN L. HOPKINS, ROBERT RAMSEY HAMADY, and FLUOR CORPORATION, ) ) ) ) | CLASS ACTION |
| Defendants. ) ) ) ) | DEMAND FOR JURY TRIAL |

Plaintiff Chadwick P. Truedson ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of NuScale Power Corporation ("NuScale" or the "Company"), the Company's press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of NuScale Class A common stock between May 13, 2025 and November 6, 2025, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") against NuScale and certain of the Company's executive officers.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

3.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and §27 of the 1934 Act, because certain of the events or omissions giving rise to the claim occurred in this District,

including the dissemination of the statements alleged to be materially false and misleading into this District. NuScale's corporate headquarters are also located in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Chadwick P. Truedson, as set forth in the certification attached hereto and incorporated by reference herein, purchased NuScale Class A common stock during the Class Period and has been damaged thereby.

6.      Defendant NuScale is a developer of nuclear power technology. NuScale Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SMR."

7.      Defendant John L. Hopkins ("Hopkins") has served as NuScale's Chief Executive Officer ("CEO") and on NuScale's Board of Directors (the "Board") since December 2012. Prior to serving as CEO, defendant Hopkins held various leadership positions at Fluor Corporation.

8.      Defendant Robert Ramsey Hamady ("Hamady") has served as NuScale's Chief Financial Officer ("CFO") since August 2023.

9.      Defendant Fluor Corporation ("Fluor") is a Texas-based engineering, energy, and construction firm. During the Class Period, Fluor was a control person of NuScale as a result of its significant ownership of NuScale stock (making Fluor the Company's largest single shareholder), its numerous commercial relationships and business arrangements with the

Company, and its historical relationship and/or control over members of NuScale's corporate board and executive management.

10.    Defendants Hopkins and Hamady are collectively referred to herein as the "Individual Defendants."

11.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, partners, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

12.    As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the 1934 Act and trade on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, partners, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of NuScale Class A common stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various

SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## BACKGROUND

14.    NuScale is a nuclear technology company focused on scalable, modular reactors. NuScale's core technology, the NuScale Power Module ("NPM"), is a small modular nuclear reactor ("SMR") designed to generate energy within a broader power plant. The Company claims the NPM has several advantages over traditional large-scale nuclear facilities, including enhanced economics, scalability over time, a simplified design, and a smaller footprint. According to NuScale, the NPM occupies a footprint of approximately 76 feet in height by 15 feet in diameter and is capable of generating 77 megawatt electrical ("MWe").

15.    The design, construction, and operation of nuclear power facilities and power plant components is highly technical, and the commercial nuclear industry is heavily regulated in all countries. Regulatory approval is required for the design, construction, and operation of every nuclear plant. Nuclear safety regulators consider numerous factors when deciding whether to grant or deny necessary permits, including, *inter alia*: (i) the design safety and robustness of the plant and its components against internal hazards (*e.g.*, component failures and fires) and external hazards (*e.g.*, earthquakes and weather loads such as snow, rain, and wind); and (ii) the

environmental impacts of construction and operations (*e.g.*, water use and the preservation of historical sites and animal and plant species).

16.    According to the International Energy Agency, nuclear power projects started between 2010 and 2020 have been delayed an average of three years due to their high technical complexity, need for highly trained specialists, strict regulations, high cost, and need to ensure against nuclear accidents (which can be devastating to human life and the environment).  In the United States, the U.S. Nuclear Regulatory Commission ("NRC") is the primary agency tasked with protecting public health and safety related to nuclear power.  The high regulatory burden placed on nuclear plant builders by the agency has led to North America experiencing the longest delays in nuclear power construction globally at more than six years delayed on average.  As a result of this intense regulatory backdrop and high technical complexity, it was of paramount importance to NuScale investors during the Class Period that the Company collaborate with qualified and highly experienced partners in the field of nuclear power plant construction and operation in the initial sale and deployment of the Company's NPMs.

17.    Although founded in 2007, NuScale has not yet commercialized or sold any NPMs. While NuScale has generated some revenue by providing engineering and licensing fees and services, those revenues have been relatively small compared to the Company's overall expenses. As a result, NuScale is not profitable and has incurred significant losses since its inception.  The launch and commercialization of NuScale's NPMs is key to the Company's business viability and highly material to the Company's investors.

18.    Prior to the start of the Class Period, NuScale entered into a global commercialization partnership with ENTRA1 Energy LLC ("ENTRA1").  NuScale and its executives claimed that this critical partnership would allow the Company to take its NPM

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Page 5

technology from the development stage to deployment, enabling NuScale's NPMs to serve as meaningful, revenue-generating components in power plants. As NuScale's exclusive "commercialization partner" for the Company's NPMs, ENTRA1 purportedly sought to deploy NuScale's products by building and constructing energy generation facilities that contain and use NPMs and was tasked with managing plant financing, development, and startup operations for all power plants utilizing NPMs. Given its central role in the launch of NuScale's NPMs, ENTRA1's qualifications, experience, and technical and operational capabilities were of critical importance to the ultimate success of NuScale's business, operations, and financial results.

19. During the Class Period, defendants emphasized ENTRA1's purported wide-ranging capabilities and deep experience in power plant development in their communications with investors. Defendants described ENTRA1 as an "independent power plant development platform" that served as a "one-stop-shop" and "single hub" for "financing, investment, development, execution, and/or management of ENTRA1 Energy™ plants with NuScale SMRs-inside." The Individual Defendants in particular highlighted ENTRA1's central role in commercializing NuScale's NPMs. For example, in August 2025, defendant Hopkins claimed the Company was "making strides towards deploying [its] technology" by utilizing its NPMs "inside ENTRA1 Energy Plants™." Defendant Hamady likewise represented that ENTRA1's role as NuScale's exclusive development partner was a key "differentiator," stating that "ENTRA1's been out there selling the [purchase power agreements] and selling the power."

20. NuScale's reliance on ENTRA1 as an exclusive commercialization partner appeared to be validated when, on September 2, 2025, ENTRA1 and the Tennessee Valley Authority ("TVA") jointly announced an agreement to develop power plants to provide the TVA

with up to six gigawatts of new nuclear power generation.  ENTRA1 stated its intention to use NuScale's SMRs inside the planned energy facilities.

21.     NuScale publicly applauded the agreement, highlighting ENTRA1's purported expertise.  At the time, Company press materials represented that ENTRA1 was an "independent global energy production platform" that was purportedly "led by an executive team of energy, infrastructure, and finance sector veterans."   Defendant Hopkins similarly highlighted the "'experience'" of ENTRA1's "'team of energy and finance veterans,'" stating that their experience is "'exactly what is required'" to commercialize and deploy NuScale's NPMs.

22.     Also on September 2, 2025, NuScale announced that its subsidiary, NuScale Power, LLC, had entered into a Partnership Milestones Agreement ("PMA") with ENTRA1, pursuant to which NuScale would be required to provide ENTRA1 with a contribution payment in the range of $35 million to $55 million for every NPM placed in an ENTRA1 power plant.  The PMA further provided that the contribution payment would be disbursed to ENTRA1 in tranches triggered by certain developmental milestones, specifically: (i) 15% of the contribution disbursed upon the execution of a non-binding term sheet with a third party; (ii) 35% of the contribution disbursed upon execution of a power purse agreement with a third party in connection with the deployment of an NPM in an energy project; and (iii) 50% of the contribution disbursed upon execution of an agreement to purchase or deploy NPMs.

23.     Unbeknownst to investors, however, during its entire operating history ENTRA1 had never built, financed, or operated any significant project, let alone one in the highly technical and difficult field of nuclear power generation.   Contrary to defendants' Class Period representations that ENTRA1 was an "independent global energy production platform," ENTRA1 had been organized primarily to support the work of a single individual, its principal, Wadie

Habboush, an investor, entrepreneur, and former attorney.   Thus, NuScale had exclusively entrusted its SMR commercialization strategy and hundreds of millions of dollars to an untested and ill-experienced partner in the field of nuclear power plant construction and component commercialization directly at odds with defendants' Class Period representations, creating material, undisclosed risks of failure, delays, regulatory challenges, and other negative setbacks for NuScale's critical NPM roll-out plans.

24.    Then, after market hours on November 6, 2025, NuScale surprised investors by revealing that the Company's general and administrative expenses had ballooned more than 3,000% to $519 million during its third fiscal quarter, up from $17 million in the prior year period, due largely to NuScale's payment of $495 million to ENTRA1 for its TVA agreement.  As a result, NuScale's quarterly net loss skyrocketed to $532 million, up from $46 million in the prior year period.

25.    During the corresponding conference call, defendant Hopkins revealed that the agreement between ENTRA1 and TVA contemplated as many as 72 NPMs, meaning NuScale's milestone payments to ENTRA1 could potentially exceed more than $3 billion.

26.    Later in the call, analysts pressed NuScale management regarding whether ENTRA1 was sufficiently experienced to own and operate the energy generation facilities contemplated by the TVA agreement, asking whether "ENTRA1 [has] ever built or owned or operated anything" and what the "actual operational capabilities and history of ENTRA1 are."  In response, defendant Hopkins claimed that ENTRA1 had "over 45 years" of experience "delivering large-scale energy and infrastructure projects worldwide."  Analysts pressed further, stating that "[i]t sounds to me like you're talking about [Habboush] Group" – a distinct entity at one point overseen by Mr. Habboush – and questioning whether "ENTRA1 has built and operated projects."

In response, defendant Hamady essentially confirmed that ENTRA1 did not itself have the relevant experience, but rather that the Company was referring to the experience of the "principles [sic] of ENTRA1." Defendant Hamady further clarified that ENTRA1 would not actually be "out there building the power plants," but rather serving "to coordinate projects, to bring in partners, to get deals and the partners they bring in that can execute."

27.    Following NuScale's earnings announcement, analysts at Guggenheim Securities, LLC ("Guggenheim Securities") published a report further undermining defendants' Class Period claims about ENTRA1's experience and capabilities. Based on the analysts' own independent checks, the report described ENTRA1 as a "3-year old company that has never built, financed or operated anything." The report stated that a review of available information about ENTRA1 revealed "no information regarding the company's history, management team, size or capitalization" and just "3 employees and 1 investor as of the writing of this note, notably CEO and Chairman Wadie Habboush." The report stated that a "more accurate description of ENTRA1" than that provided by defendants "would be that it is an entity supporting the activities of a single individual, specifically Mr. Habboush." The report criticized NuScale for its lack of transparency regarding ENTRA1, stating that "[w]e do not think [NuScale] has been as clear regarding ENTRA1 as it could have been" and described the Company's representations regarding the entity as "problematic."

28.    Similarly, a report by Barclays Capital Inc. ("Barclays") analysts noted that "NuScale's 3Q25 call was dominated by questions around the TVA/ENTRA1 agreement, the mechanics and implications of the Partnership Milestone Agreement (PMA), ENTRA1's credentials, Fluor's planned exit, and the company's evolving capital needs and project pipeline," leading to "more questions than answers." In particular, the report noted that "ENTRA1's

background draws scrutiny" with many analysts "rais[ing] questions about ENTRA1, as the company is not well known in the industry and lacks a sophisticated website or public record of completed projects."

29.     On this news, the price of NuScale Class A shares declined more than 12% over a two-day trading period on abnormally high trading volume, from approximately $32 per share on November 6, 2025 to approximately $28 per share on November 10, 2025.  The price of NuScale Class A stock continued to fall in subsequent days, dropping to a low of just $17 per share by November 21, 2025 – more than 70% below the Class Period high of more than $57 per share – and causing plaintiff and the Class (defined below) to suffer significant financial losses and economic damages under the federal securities laws.

## MATERIALLY FALSE AND MISLEADING STATEMENTS
## AND OMISSIONS ISSUED DURING THE CLASS PERIOD

30.     The Class Period begins on May 13, 2025.  After market close on May 12, 2025, NuScale reported its financial results for its first fiscal quarter ending March 31, 2025.  That same day, NuScale held a conference call with analysts to discuss the Company's financial and operational results, which was hosted by defendants Hopkins and Hamady.  During his prepared remarks, defendant Hopkins emphasized ENTRA1's "lead[ing]" role in customer discussions and claimed "[p]otential customers" were "attracted to ENTRA1's commercial model," stating in pertinent part as follows:

> In collaboration with our exclusive commercialization partner, ENTRA1 Energy, we are in various stages of discussions with potential customers, both here in the US and abroad.  Domestically, this includes discussions with government officials and industries, including data centers, utilities, coal plant operators transitioning to nuclear, and petrochemical and energy companies.  Internationally, with stakeholders around the globe in Europe, the Middle East, Africa and Asia.

> On the data center front, ENTRA1 continues to lead discussions with major US hyperscalers, with a strong focus on powering AI operations.  Potential

customers continue to be attracted to ENTRA1's commercial model, which is designed to provide financial flexibility while mitigating deployment risks.

31.    Also on May 12, 2025, NuScale filed with the SEC a quarterly report on Form 10-Q for the quarter ending March 31, 2025 ("1Q25 Form 10-Q").  NuScale filed as an exhibit to the 1Q25 Form 10-Q the Strategic Alliance Agreement dated May 7, 2025 between NuScale Power, LLC (a subsidiary of NuScale ) and ENTRA1, which was incorporated by reference into the 1Q25 Form 10-Q (the "Strategic Agreement").

32.    The Strategic Agreement emphasized ENTRA1's purported "experience" developing, managing, and financing global infrastructure projects, stating in pertinent part as follows:

> Whereas, the Company desires the access to ENTRA1's wide global network of relationships and appreciates ENTRA1's experience in connection with the development, management, and finance (including arranging/evaluating finance options) for global infrastructure projects[.]

33.    On May 29, 2025, NuScale issued a press release announcing that the Company had received design approval from the NRC for its uprated 250 MWt NuScale Power Module ("May 2025 Press Release").  The May 2025 Press Release represented that ENTRA1 was an "independent power plant development platform" and claimed the NRC's approval had "strengthen[ed]" ENTRA1 to deliver energy via its "ENTRA1 Energy Plants™," stating in pertinent part as follows:

> The U.S. NRC's uprate approval of the NuScale SMR technology now strengthens ENTRA1 Energy to produce and deliver energy as the most near-term American SMR power solution via ENTRA1 Energy Plants™ with NuScale SMR technology inside.  ENTRA1 Energy is NuScale's partner and independent power plant development platform, which holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's SMRs.

> The uprate approval by the U.S. regulatory authority increases the power output per module from NuScale's previously-approved 50 MWe design, enabling

ENTRA1 Energy Plants to provide a wider range of off-takers and consumers with reliable, carbon-free energy.

34.     The May 2025 Press Release further claimed ENTRA1 was a "one-stop-shop" and "single hub" for "financing, investment, development, execution, and/or management of ENTRA1 Energy Plants™ with NuScale SMRs-inside."

35.     On August 7, 2025, NuScale issued a release reporting the Company's financial results for its second fiscal quarter ending June 30, 2025 ("2Q25 Release"). The 2Q25 Release quoted defendant Hopkins who highlighted NuScale's "partnership with ENTRA1" and the Company's efforts to commercialize its technology "inside ENTRA1 Energy Plants™," stating in pertinent part as follows:

> With that distinction, as well as our partnership with ENTRA1 to commercialize our SMR technology inside ENTRA1 Energy Plants™, we are making strides toward deploying our technology. We look forward to providing safe, reliable, and sustainable energy technology for communities around the world.

36.     That same day, NuScale held a conference call with analysts to discuss the Company's financial and operational results for its second fiscal quarter of 2025, which was hosted by defendants Hopkins and Hamady. During his prepared remarks, defendant Hopkins highlighted NuScale's "global commercial partnership" with ENTRA1 and represented that ENTRA1 provided "customized plant development, ownership, and operating structures," stating in pertinent part as follows:

> Under this partnership, NuScale serving as a technology provider sells its NuScale power modules directly to ENTRA1 for installation and reactor buildings of ENTRA1 energy plants. ENTRA1, in turn, develops, finances and, depending on the business model, may own and operate the energy production plants powered by NuScale's SMR technology.
>
> By providing customized plant development, ownership, and operating structures, ENTRA1 is able to de-risk projects and meet each customer's unique needs.

37.    Defendant Hamady referred analysts and investors to a presentation used in connection with the conference call, which he stated contained a "good explanation of the business plan with ENTRA1."    The presentation contained the following slide regarding NuScale's "exclusive global strategic partner commercializing [its] SMR technology," ENTRA1:



38.    Defendant Hamady similarly represented that ENTRA1 "is a developer of [power plants]" that use NPMs and that the entity's work as NuScale's developer was a "differentiator" for the Company, stating in pertinent part as follows:

> [B]ut it's important to remember, when we say – when we talk about our customers, ENTRA1 is our customer.    ENTRA1 is a developer of [power plants].    They're ENTRA1 power plants with NuScale in site, like computers like an Intel chip, where the Intel chip inside in this case, in the power plant.
>
> So we're hand in glove potential one.    I don't sell – we talk about discussions with the utility from the hyperscaler and the military of the U.S. government.    Those are all end users but we don't sell electrons, right?
>
> So I want to kind of reset and kind of level of the idea that we sell NPMs, NuScale power modules.    This power modules going through the plant.    ENTRA1

develops the plant. They may own and operate the plant. There's different business models, but it's an ENTRA1 plant and ENTRA1 sells the energy to the customer.

Whether it be a utility or government or military, whomever it is, ENTRA1's been out there selling the PPAs and selling the power. So it's – just so we kind of cross this correctly. I want the market to understand what the story is and what the business model is because that business model, the fact that we have ENTRA1 as our developer is a differentiator, right?

39.    Defendant Hamady continued in pertinent part as follows:

We develop technology. Technology is for a NuScale power module. NuScale power module is built. We're kind of an OEM reseller – sorry, we're an OEM seller of a piece of equipment. We outsource that equipment. We outsource the production. We deliver it [to an ENTRA1] power plant and ENTRA1 puts the power front and then sell the power.

So again, we talk about customers, let's be clear, I do this for some of our newer analysts, I think it's important. We have one customer, that customer is ENTRA1. ENTRA1 faces the market. They develop the power plants, they sell the power. We just sell the NuScale power module where the Intel side of the lap[top], if you use that analogy [or whatever analogy] you want to use. We're the tech inside the power plant. We're not the power plant developer.

40.    On September 2, 2025, NuScale filed with the SEC a current report on Form 8-K ("September 2025 Form 8-K"). NuScale filed the PMA as an exhibit to the September 2025 Form 8-K. The PMA highlighted the purported "expertise" and "distinctive capabilities" of ENTRA1, which the PMA claimed advanced commercial development of NuScale's technology, stating in pertinent part as follows:

Whereas, NuScale acknowledges ENTRA1's efforts, expertise, and strategic support and recognizes that, without ENTRA1's contributions, work, distinctive capabilities, and active involvement as a strategic partner, such opportunities would not have been available;

. . . Whereas, NuScale acknowledges the substantial value generated through ENTRA1's contributions and that such contributions have materially advanced the commercial development, positioning, and success of bringing its technology to market[.]

41.    On September 3, 2025, NuScale issued a release announcing its support for ENTRA1's agreement with the TVA to deploy up to six gigawatts of NuScale SMR capacity

("September 2025 Release").  The September 2025 Release quoted defendant Hopkins who emphasized the purported "'experience'" of the ENTRA1's "'team of energy and finance veterans'" and claimed their experience is "'exactly what is required'" to commercialize and deploy NPMs, stating in pertinent part as follows:

> "ENTRA1's team of energy and finance veterans brings exceptional value to our partnership – combining energy sales knowledge, investment and asset management capabilities, deep project finance expertise, and experience in delivering large-scale power infrastructure.  Their experience is exactly what is required as we enter this critical next phase of commercializing and deploying NuScale Power Modules™ into ENTRA1 Energy Plants™.  Together, we are ready as partners to meet America's surging demand for reliable, carbon-free baseload power – powering AI data centers, critical mining, semiconductor manufacturing, and the energy-intensive industries that are driving our nation's economic future."

42.    In addition, the September 2025 Release represented that ENTRA1 was an "independent global energy production platform," which it claimed was "led by an executive team of energy, infrastructure, and finance sector veterans," stating in pertinent part as follows:

> ENTRA1 Energy is an American independent global energy production platform dedicated to increasing energy security by providing safe, reliable, baseload energy.  ENTRA1 Energy is led by an executive team of energy, infrastructure, and finance sector veterans drawing on significant experience in the investment, development, and execution of critical infrastructure projects globally.  ENTRA1 Energy is focused on producing and selling power by commercializing and deploying American nuclear and natural gas technologies in its power infrastructure assets.

> ENTRA1 Energy is NuScale's exclusive global strategic partner, and the two companies have an existing 50/50 joint venture company – ENTRA1 NuScale LLC.  ENTRA1 Energy holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's products and services.  ENTRA1 Energy is the one-stop-shop and single hub for the deployment, financing, investment, development, execution, and/or management of ENTRA1 Energy Plants™ with NuScale SMRs inside.

43.    The statements referenced in ¶¶30-42 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the

Company's business, operations, and financial condition, which were known to defendants or recklessly disregarded by them as follows:

      (a)    that ENTRA1 had never built, financed, or operated any significant projects – let alone projects in the highly technical and complicated field of nuclear power generation – during its entire operating history;

      (b)    that NuScale had entrusted its commercialization, distribution, and deployment of its NPMs and hundreds of millions of dollars of Company capital to an entity that lacked any significant prior experience owning, financing, or operating nuclear energy generation facilities;

      (c)    that the purported experience and qualifications attributed to ENTRA1 by defendants during the Class Period in fact referred to the purported experience and qualifications of the principals of the Habboush Group, a distinct entity without significant experience in the field of nuclear power generation; and

      (d)    that as a result of (a)-(c) above, NuScale's commercialization strategy was exposed to material, undisclosed risks of failure, delays, regulatory challenges, or other negative setbacks.

44.    Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and required each risk factor to "adequately describe[] the risk."

45.    The failure of NuScale's periodic SEC filings to disclose the true qualifications and experience (or lack thereof) of the Company's exclusive commercialization partner violated Item 303, because these undisclosed facts were known to defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in NuScale stock speculative or risky.

46.    Then, on November 6, 2025, NuScale surprised investors by revealing that the Company's general and administrative expenses had ballooned more than 3,000% to $519 million during its third fiscal quarter, up from $17 million in the prior year period, due largely to NuScale's payment of $495 million to ENTRA1 for its TVA agreement.  As a result, NuScale's quarterly net loss skyrocketed to $532 million, up from $46 million in the prior year period.

47.    During the corresponding conference call, defendant Hopkins revealed that the agreement between ENTRA1 and TVA contemplated as many as 72 NPMs, meaning NuScale's milestone payments to ENTRA1 could potentially exceed more than $3 billion.

48.    Later during the call, analysts focused on the qualifications and experience of ENTRA1, as this information was highly material to investors given ENTRA1's status as NuScale's exclusive commercialization partner.  For example, an analyst from Guggenheim Securities inquired about ENTRA1's experience and capabilities, asking whether "ENTRA1 [has] ever built or owned or operated anything" and what the "actual operational capabilities and history of ENTRA1 are?"  In response, defendant Hopkins referred to the "over 45 years" of the Habboush Group, a separate entity, continuing in pertinent part as follows:

> Yeah, I can start.  They're an independent global energy company, and they have – to your point, over 45 years as [Habboush] [G]roup, years of experience,

delivering large-scale energy and infrastructure projects worldwide. In fact, part of the due diligence we went into the program was looking at their extensive knowledge of building coal-fired plants, combined cycle plants.

So they've had a lot of – it's not – it's a family name that is not well known in the industry, but they've had significant experience in building these plants globally.

49.    The analyst pressed further, noting that "[i]t sounds to me like you're talking about [Habboush] Group" and questioning whether "ENTRA1 has built and operated projects." In response, defendant Hamady essentially confirmed that ENTRA1 did not itself have the relevant experience, but rather that the Company was referring to the experience of the "principles [sic] of ENTRA1." Defendant Hamady further clarified that ENTRA1 would not actually be "out there building the power plants," but rather serving "to coordinate projects, to bring in partners, to get deals and the partners they bring in that can execute."

50.    Following NuScale's earnings announcement, analysts continued to focus on the experience and qualifications of ENTRA1, evidencing this information's high materiality to NuScale's investors given ENTRA1's role as NuScale's exclusive commercialization partner. For example, Guggenheim Securities published a report questioning ENTRA1's experience and capabilities. Based on their own independent checks, the report described ENTRA1 as a "3-year old company that has never built, financed or operated anything." The report stated that a review of available information about ENTRA1 revealed "no information regarding the company's history, management team, size or capitalization" and just "3 employees and 1 investor as of the writing of this note, notably CEO and Chairman Wadie Habboush." The report stated that a "more accurate description of ENTRA1" than that provided by defendants "would be that it is an entity supporting the activities of a single individual, specifically Mr. Habboush." The report criticized NuScale for its lack of transparency regarding ENTRA1, stating that "[w]e do not think [NuScale]

has been as clear regarding ENTRA1 as it could have been" and described the Company's representations regarding the entity as "problematic."

51.     Similarly, a report by Barclays analysts noted that "NuScale's 3Q25 call was dominated by questions around the TVA/ENTRA1 agreement, the mechanics and implications of the Partnership Milestone Agreement (PMA), ENTRA1's credentials, Fluor's planned exit, and the company's evolving capital needs and project pipeline," leading to "more questions than answers." In particular, the report noted that "ENTRA1's background draws scrutiny" with many analysts "rais[ing] questions about ENTRA1, as the company is not well known in the industry and lacks a sophisticated website or public record of completed projects."

52.     On this news, the price of NuScale Class A shares declined more than 12% over a two-day trading period, from approximately $32 per share on November 6, 2025 to approximately $28 per share on November 10, 2025. Each trading day evinced abnormally high trading volume, with more than 42 million NuScale shares traded on November 7, 2025 and more than 31 million NuScale shares traded on November 10, 2025 (the next trading day).

53.     On November 14, 2025, analysts at Iceberg Research – which claims to identify "substantial earnings misrepresentation and accounting irregularities in financial statements issued by public companies," often taking short positions in the companies covered – published a report highly critical of NuScale's relationship with ENTRA1. The report built on the critiques levied by other investment analysts and stated that, based on its own research, ENTRA1 appeared to share an office with NuScale, "rais[ing] questions whether the contract was signed at arm's length and whether funds are being siphoned out of NuScale." The report further noted that, even if investors were to rely on the purported experience of the Habboush Group in assessing ENTRA1's qualifications, "Habboush has no experience in the nuclear industry" and the "opacity of the group

and its Middle Eastern origin are not going to help convince the regulators and the citizens of conservative states where TVA operates (Tennessee, Alabama, Mississippi, Kentucky, Georgia, North Carolina, and Virginia)."

54.    The price of NuScale Class A stock has continued to fall since the end of the Class Period, dropping to a low of just $17 per share by November 21, 2025 – more than 70% below the Class Period high of more than $57 per share – and causing plaintiff and the Class to suffer significant financial losses and economic damages under the federal securities laws.

**ADDITIONAL SCIENTER ALLEGATIONS**

55.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding NuScale, and their control over and/or receipt and/or modification of NuScale's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

56.    Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  Accordingly, the fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

57.    The Individual Defendants, because of their positions with NuScale, controlled the contents of NuScale's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, nonpublic information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of NuScale's corporate statements and is, therefore, responsible and liable for the representations contained therein.

58.    NuScale's exclusive partnership with ENTRA1 and the commercial launch of its NPMs were among the most important issues facing the Company and the focus of NuScale's management, including the Individual Defendants.  The Individual Defendants repeatedly held themselves out as the persons most knowledgeable regarding ENTRA1's experience and capabilities.  For example, in speaking with analysts and investors during NuScale's November 2025 earnings call, defendant Hopkins represented that he and others at NuScale performed substantial due diligence on ENTRA1's purported prior experience, which he stated included "looking at their extensive knowledge of building coal-fired plants, combined cycle plants."

59.    Defendants also had the motive and opportunity to defraud investors.  While the price of NuScale Class A shares was artificially inflated, NuScale sold more than $475 million worth of NuScale shares through a registered offering conducted in August 2025.  In addition, Fluor stated its intention to completely exit its NuScale position and sold more than $600 million worth of NuScale shares during the Class Period.  Fluor's sales were suspicious in both timing and

amount and occurred just weeks before the corrective information alleged herein was revealed to the market.

## CLASS ACTION ALLEGATIONS

60.    Plaintiff brings this action as a class action on behalf of a class consisting of all persons who purchased NuScale Class A common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers, directors, and affiliates of defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, shares of NuScale Class A common stock were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by NuScale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

62.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

63.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants' statements during the Class Period were materially false and misleading;

(b)     whether defendants acted with scienter in issuing materially false and misleading statements during the Class Period; and

(c)     the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

65.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

66.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of NuScale Class A common stock and operated as a fraud or deceit on Class Period purchasers of NuScale Class A common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of NuScale Class A common stock declined significantly as the prior artificial inflation came out of the price of the stock, as detailed herein.  As result of their purchases

of NuScale Class A common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF THE PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

67.     At all relevant times, the market for NuScale Class A common stock was an efficient market for the following reasons, among others:

(a)     NuScale Class A common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, national stock market;

(b)     as a regulated issuer, NuScale filed periodic public reports with the SEC;

(c)     according to the Company's Form 10-Q for the fiscal quarter ended September 30, 2025, NuScale had approximately 167 million Class A common shares outstanding as of October 31, 2025;

(d)     NuScale regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about NuScale was rapidly reflected in and incorporated into prices for shares of NuScale Class A common stock during the Class Period.

68.     As a result of the foregoing, the market for NuScale Class A common stock promptly digested current information regarding NuScale from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of NuScale Class A common stock during the Class Period suffered similar injury through their purchases of NuScale Class A common stock at artificially inflated prices and a presumption of reliance applies.

69.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on defendants' material misstatements and/or omissions.   Because this action involves defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

70.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint.  Many of the specific statements pled herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pled herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of NuScale who knew that those statements were false when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Promulgated Thereunder
### Against Fluor and the Individual Defendants

71.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.     During the Class Period, the defendants named herein disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

73.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of NuScale Class A common stock during the Class Period.

74.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NuScale Class A common stock.  Plaintiff and the Class would not have purchased NuScale Class A common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

75.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of NuScale Class A common stock during the Class Period.

### COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

76.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     During the Class Period, the Individual Defendants and Fluor acted as controlling persons of NuScale within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about NuScale, ownership of Fluor stock, and relationships with the Company, the Individual Defendants had the power and ability to control the actions of NuScale and its employees.

78.     Similarly, Fluor was a control person of NuScale as a result of its significant ownership of NuScale stock (making Fluor the Company's largest single shareholder), its numerous commercial relationships and business arrangements with the Company, and its historical relationship and/or control over members of NuScale's corporate board and executive management.

79.     NuScale controlled the Individual Defendants and all of its other officers and employees.

80.     By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Page 27

A.    Designating plaintiff as Lead Plaintiff and plaintiff's counsel as Lead Counsel and declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper, including permitting any putative Class members to exclude themselves by requesting exclusion through noticed procedures.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  February 18, 2026                    KELLER ROHRBACK L.L.P.

<u>By: s/ Keil M. Mueller</u>

KEIL M. MUELLER, OSBN 085535
kmueller@kellerrohrback.com
601 SW Second Avenue, Suite 1900
Portland, OR  97204
Telephone:  971/253-4600

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN *Pro Hac Vice* Forthcoming
bcochran@rgrdlaw.com
FRANCISCO J. MEJIA *Pro Hac Vice* Forthcoming
fmejia@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN *Pro Hac Vice*
Forthcoming
srudman@rgrdlaw.com
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100

Attorneys for Plaintiff