KELLER ROHRBACK L.L.P.
KEIL M. MUELLER, OSB No. 085535
kmueller@kellerrohrback.com
601 SW Second Avenue, Suite 1900
Portland, OR 97204
Telephone: 971/253-4600

Local Counsel

ROBBINS GELLER RUDMAN
& DOWD LLP
KEVIN A. LAVELLE
klavelle@rgrdlaw.com
TING H. LIU
tliu@rgrdlaw.com
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CHADWICK P. TRUEDSON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NUSCALE POWER CORPORATION, JOHN L. HOPKINS, ROBERT RAMSEY HAMADY, FLUOR CORPORATION, ALAN BOECKMANN, JIM BREUER, ALVIN C. COLLINS, III, ENTRA1 ENERGY LLC, and WADIE J. HABBOUSH,<br><br>Defendants. | Case No. 3:26-cv-00328-JR<br><br><u>CLASS ACTION ALLEGATION</u><br><br>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>DEMAND FOR JURY TRIAL</u> |

## TABLE OF CONTENTS


Page

I. INTRODUCTION ....................................................................................1

II. NATURE OF THE ACTION ....................................................................8

III. JURISDICTION AND VENUE ..................................................................9

IV. THE PARTIES ....................................................................................9

A. Lead Plaintiffs ....................................................................................9

B. Defendants ....................................................................................10

1. NuScale and its CEO and CFO ....................................................................10

2. Fluor and Certain NuScale Directors ....................................................................11

3. NuScale, Fluor, and Hamady's Class Period Sales of NuScale Common Stock, Totaling over a Billion Dollars ....................................................................14

4. The ENTRA1 Defendants ....................................................................15

V. SUBSTANTIVE ALLEGATIONS ....................................................................16

A. General Overview of the Commercial Nuclear Power Industry ....................................................................16

1. Nuclear Power Plants are Among the Most Heavily Regulated Industrial Facilities in the World ....................................................................17

2. Nuclear Plant Development Is Extremely Difficult and Requires Significant Nuclear Experience to Successfully Execute ....................................................................20

a. Nuclear Plant Construction is Plagued by Cost Overruns and Delays that Undermine Project Viability ....................................................................20

b. Experience in the Field Is Vital to the Successful Execution of Nuclear Projects ....................................................................22

c. New Regulatory Pathways and Modular Reactor Designs Have Not Reduced the Cost or Complexity of Building Nuclear Power Plants ....................................................................24

B. NuScale Power ....................................................................26

1. After Nearly 20 Years, NuScale Has yet to Sell a Single Nuclear Reactor ....................................................................26

**Page**


2. No Stranger to the Difficulties of Nuclear Plant Development, NuScale's Own Flagship Project Fails Due to Runaway Costs, Sending the Company into a Tailspin ....... 28

3. Seeking to Redeem Itself, NuScale's Relationship with ENTRA1 Comes into Focus, Accompanied by the Promise of Imminent Customer Contracts ....... 29

a. NuScale Puts All Its Eggs in One Basket, Entering into an "Exclusive" Partnership with ENTRA1 ....... 31

b. NuScale and ENTRA1 Subsequently Fail to Deliver a Final Customer Agreement ....... 33

c. ENTRA1 Announces a Non-Binding Agreement with the TVA and a Highly Unusual Payment Scheme with NuScale ....... 33

C. Investors Learn ENTRA1 Is Really "Just a Couple of Guys" and Has Never Built Anything, Let Alone a Nuclear Power Plant ....... 38

D. NuScale Sells Hundreds of Millions of Dollars of Company Common Stock to Fund Its Business and Pay ENTRA1 ....... 46

E. Starting the Following Month, Fluor Sells $600 Million in NuScale Common Stock ....... 46

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ....... 47

A. NuScale and the Individual Defendants' Misstatements and Omissions ....... 47

B. Items 303 and 105 ....... 60

VII. ADDITIONAL SCIENTER AND SCHEME ALLEGATIONS ....... 61

A. Defendants Knew or Were Reckless in Not Knowing that ENTRA1 Was Unqualified ....... 61

1. NuScale and the Individual Defendants Held Themselves out as Knowledgeable Regarding ENTRA1's Experience and Capabilities ....... 62

2. The Defendants Had Longstanding Relationships with ENTRA1's CEO and CPO, and NuScale Even Shared an Address with ENTRA1 ....... 64

**Page**


3. Defendants Understood Investors Wanted More Information Regarding ENTRA1's Credentials, but They Continued to Conceal that Information ........65

4. The Alleged Misrepresentations and Omissions Concerned NuScale's Core Operations ........66

B. Motive and Opportunity ........67

C. Corporate Scienter ........68

D. The One-Sided Nature of the PMA Is Indicative of Scienter and Constitutes a Separate, but Related Scheme ........69

E. NuScale's Revolving Door of Legal Counsel During the Class Period ........70

VIII. LOSS CAUSATION AND ECONOMIC LOSS ........71

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ON THE FRAUD-ON-THE MARKET DOCTRINE ........74

X. CLASS ACTION ALLEGATIONS ........74

XI. COUNTS FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS ........76

XII. PRAYER FOR RELIEF ........80

XIII. JURY DEMAND ........81

Lead Plaintiffs IAM National Pension Fund and Local 353, I.B.E.W. Pension Fund (collectively, "Plaintiffs" or "Lead Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by NuScale Power Corporation ("NuScale" or the "Company") and the Company's conference call transcripts, press releases, analyst reports, media reports, and other publicly disclosed information about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a securities fraud class action concerning an attempt by corporate executives at NuScale to bilk investors out of hundreds of millions of dollars – while lining the pockets of Company insiders – by touting an "exclusive" commercialization partnership with ENTRA1 Energy LLC ("ENTRA1"), and the business it supposedly would soon be bringing to NuScale's doorstep. But in proclaiming ENTRA1's ability to finance, build, and operate nuclear facilities powered by NuScale reactors, NuScale and its management concealed that ENTRA1 lacked any nuclear experience or established project-development capabilities.

2. In truth, ENTRA1 had never built, financed, or operated any significant projects – let alone nuclear energy projects. Its principals, in fact, had zero experience developing nuclear power plants. ENTRA1 was instead comprised of Wadie Joseph Habboush ("Habboush") – an entrepreneur with longstanding connections to NuScale's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and the Company's largest shareholder, Fluor Corporation ("Fluor") –

and a handful of employees that identified a WeWork office address as their headquarters. As one Wall Street analyst put it, ENTRA1 was, in reality, "'***just a couple of guys***,'" not the "global powerhouse in the energy sector" that NuScale made it out to be. Indeed, according to the analyst, the Company's "communications regarding ENTRA1" were "***problematic***."

3. NuScale, nevertheless, holds itself out as the "future" of advanced nuclear power in this country. It is focused on commercializing NuScale Power Modules ("NPMs") – small modular nuclear reactors or "SMRs." Although founded in 2007, NuScale has not yet commercialized or sold any NPMs, and the revenues it has generated from engineering and licensing fees and services are small compared to the Company's overall expenses. As a result, NuScale is not profitable and has incurred significant losses since its inception. The launch and commercialization of the Company's NPMs is therefore key to NuScale's viability and highly material to its investors.

4. The design, construction, and operation of nuclear power facilities, however, is highly technical and strictly regulated, making nuclear development projects among the most complex and difficult in the world. They require highly trained specialists and, if not effectively managed, are subject to massive cost overruns and multi-year delays that can lead to the collapse of such projects. It was therefore of paramount importance to NuScale investors that the Company collaborate with qualified and experienced partners in the field of nuclear power plant construction and operation in order to successfully commercialize the Company's NPMs, a fact NuScale knew all too well.

5. Prior to the start of the Class Period (defined below), NuScale's flagship project, building a nuclear plant that would provide power to a consortium of small public utilities known as UAMPS, failed spectacularly in late 2023, after 10+ years of development, as the project's price tag more than doubled and the timeline was pushed back repeatedly until it was seven years behind schedule. As a result of the project's collapse, NuScale's stock price cratered and the Company laid

off a third of its employees as it struggled to find a new path forward. Yet, an entire year passed and NuScale still had not found a new customer willing to purchase the Company's NPMs.

6. With the Company's prospects dim, NuScale aimed to sell investors on a new story, this time with ENTRA1 at the center. In a March 2025 earnings call at the start of the Class Period, NuScale's CEO, John L. Hopkins ("Hopkins"), told investors that, due to a partnership with ENTRA1, NuScale was "primed for ***immediate*** commercial development" and "poised to move to ***exploding*** demand." According to NuScale, ENTRA1 was a "'one-stop-shop'" for potential customers, offering "facility design and construction, development, financing, licensing, manufacturing and operation[al]" capabilities that would deliver nuclear power to customers "within acceptable cost, time and risk profiles."

7. Throughout the Class Period, NuScale and its management, in their communications with investors, repeatedly emphasized ENTRA1's purported abilities, claiming that "ENTRA1's capabilities extend to providing bespoke [nuclear] plant development, ownership, and operating mechanisms." ENTRA1's role as NuScale's development partner was therefore a key "differentiator" for the Company, according to NuScale's CFO, Robert Ramsey Hamady ("Hamady").

8. In May 2025, NuScale and ENTRA1 even finalized an "exclusive" global commercialization partnership. NuScale and its executives claimed that this critical partnership would enable the Company to advance its NPM technology from the development stage to deployment. As NuScale's exclusive commercialization partner, ENTRA1 would, among other things, build nuclear plants that would be powered by the Company's NPMs. ENTRA1 was therefore tasked with managing all aspects of plant financing, development, and operations.

9. Given its central role in the launch of NuScale's NPMs, ENTRA1's qualifications, experience, and technical and operational capabilities were of critical importance to the ultimate success of NuScale's business. As one Wall Street analyst wrote, "it is fair to say that ENTRA1 plays a ***pivotal role*** in [NuScale's] future," while another stated that NuScale had "effectively put '***all its eggs in one basket***' with ENTRA1. Thus, "[a]s exclusive developer for the NPM, NuScale's ***future success is tied to ENTRA1's reputation and ability to execute on project development***."

10. When the promised deals failed to materialize, however, the Company's stock price fell, dropping nearly 12%, from $44.68 per share on August 7, 2025, to $39.35 per share on August 8, 2025, when the Company failed to announce any new information regarding customer contracts. As Citi analyst Vikram Bagri ("Bagri") explained in an August 8, 2025 report, "[w]e expect a negative reaction due to," among other things, NuScale having provided "no incremental updates on domestic customer contract." This disclosure acted as a partial corrective disclosure, as the market got its first inkling that ENTRA1's abilities had been badly overstated and, as a result, no firm customer orders were then forthcoming.

11. NuScale's reliance on ENTRA1, however, appeared to be validated on September 2, 2025, when ENTRA1 and the Tennessee Valley Authority ("TVA") jointly announced an agreement to develop power plants to provide the TVA with up to six gigawatts of new nuclear power generation using NuScale's NPMs inside the planned energy facilities. If it came to fruition, the agreement would be among the largest of its kind. NuScale publicly applauded the collaboration, highlighting ENTRA1's purported expertise, with John Hopkins, NuScale's CEO, gushing in press materials that the "'experience'" of ENTRA1 and its team was "'exactly what is required'" to commercialize NuScale's NPMs. Unsurprisingly, NuScale's stock price rose in response to this news.

12. Yet, also on September 2, 2025, NuScale announced that its subsidiary, NuScale Power LLC, had entered into a Partnership Milestone Agreement ("PMA") with ENTRA1, pursuant to which NuScale would be required to provide ENTRA1 with contribution payments disbursed in tranches triggered by certain developmental milestones. As analysts dug into the details, it became apparent that the PMA was not a good deal for NuScale or its investors, especially given ENTRA1's (still undisclosed) lack of relevant experience and capabilities.

13. In reports published after market close on September 2 and September 3 of 2025, analysts highlighted that, under the terms of the PMA, NuScale could be on the hook to ENTRA1 for a nearly $500 million cash payment, as a result of the TVA agreement, despite the fact that the TVA deal was not, in fact, binding – *i.e.*, that no final deal with the TVA had been and might ever be reached. As analysts noted, the terms of the PMA appeared both opaque and shockingly ***unfavorable*** to NuScale. For example, there was ***no*** clawback for the funds should ENTRA1 be unable to close the deal (*i.e.*, it was irrevocable), no requirement that ENTRA1 actually build the plants on time ***or*** on budget, and no requirement that ENTRA1 use NuScale's NPMs ***at all***.

14. NuScale had thus entrusted its entire commercialization strategy and, potentially, hundreds of millions of dollars to an untested and inexperienced partner in the field of nuclear power plant construction – facts directly at odds with defendants' Class Period representations, which created material, undisclosed risks of failure, delays, regulatory challenges, and other negative setbacks for NuScale's critical NPM roll-out plans. Thereafter, on September 4, 2025, NuScale's stock price fell 10.9%, from $40.42 per share on September 3, 2025, to $36.03 per share on September 4, 2025. As analysts from Barclays explained in a September 29, 2025 report, the TVA announcement "resulted in a spike in the share price but then traded lower as details about milestone payments were released."

15. The full truth began to be revealed to the market during NuScale's November 6, 2025 earnings call for the Company's 3Q25[1] results – analysts' first opportunity to question NuScale about ENTRA1 and the PMA since the TVA agreement was announced. On the earnings call, NuScale confirmed the $500 million milestone payment to ENTRA1, and analysts pressed NuScale's management regarding whether ENTRA1 was sufficiently experienced to build, own, and operate the energy generation facilities contemplated by the TVA agreement, asking whether "ENTRA1 [has] ever built or owned or operated anything" and what the "actual operational capabilities and history of ENTRA1 are." In response, Hopkins claimed that ENTRA1 had "over 45 years" of experience "delivering large-scale energy and infrastructure projects worldwide."

16. Yet analysts continued to press further, stating that "[i]t sounds to me like you're talking about [Habboush] Group," a ***different***, ***distinct*** entity from ENTRA1, then asking point blank whether "***ENTRA1*** has built and operated projects." In response, defendant Hamady essentially confirmed that ENTRA1 did not itself have the relevant experience, but rather that the Company was referring to the experience of the "principles [sic] of ENTRA1." Defendant Hamady then further contradicted the Company's prior statements, stating that ENTRA1 would not actually be "out there building the power plants," but rather serving "to coordinate projects, to bring in partners, to get deals and the partners they bring in that can execute." By the end of the earnings call, it was becoming apparent to the market that ENTRA1 had never built or operated anything, and that no one at ENTRA1 had any experience in the nuclear field.

17. Following NuScale's earnings call, analysts at Guggenheim Securities published a report further undermining defendants' Class Period claims about ENTRA1's experience and

[1] Specific quarters are designated by the quarter number followed by the letter "Q" and the applicable year. Thus, "3Q25" refers to the Company's third quarter of 2025. The same convention is used throughout this Complaint.

capabilities. Based on the analysts' own independent checks, the report described ENTRA1 as a "3-year old company that has ***never built, financed or operated anything***." The report stated that a review of available information about ENTRA1 revealed "no information regarding the company's history, management team, size or capitalization" and just "***3 employees*** and 1 investor as of the writing of this note, notably CEO and Chairman Wadie Habboush."

18. The report further stated that a "more accurate description of ENTRA1" than that provided by defendants "would be that it is an entity supporting the activities of a single individual, specifically Mr. Habboush." The report ultimately criticized NuScale for its lack of transparency regarding ENTRA1, stating that "[w]e do not think that [NuScale] has been as clear regarding ENTRA1 as it could have been" and described the Company's representations regarding the entity as "problematic."

19. Similarly, a report by Barclays analysts noted that "NuScale's 3Q25 call was dominated by questions around," among other things, "the TVA/ENTRA1 agreement, the mechanics and implications of the Partnership Milestone Agreement (PMA), [and] ENTRA1's credentials," leading to "more questions than answers." In particular, the report noted that "ENTRA1's background draws scrutiny" with many analysts "rais[ing] questions about ENTRA1, as the company is not well known in the industry and lacks a sophisticated website or public record of completed projects."

20. Following the Company's 3Q25 earnings call, the price of NuScale Class A common stock declined more than 12% over a 2-day trading period, from approximately $32 per share on November 6, 2025, to approximately $28 per share on November 10, 2025. The price of NuScale Class A common stock continued to fall in subsequent days, dropping to a low of just $17 per share by November 21, 2025 – more than 70% below the Class Period high of more than $57 per share –

and causing Plaintiffs and the Class (defined below) to suffer significant financial losses and economic damages.

21. NuScale and its largest investor, Fluor, however, made out like bandits, selling ***over a billion dollars*** of NuScale Class A common stock during the Class Period at prices artificially inflated by the fraud and while in possession of material, non-public information regarding ENTRA1's lack of experience and capabilities. NuScale raised over $475 million in an "at-the market" offering program starting in August 2025 to fund its continuing operations and pay off ENTRA1, and Fluor made over $600 million in gross proceeds selling 15 million shares of NuScale common stock in September and October of 2025. In other words, NuScale and Fluor walked off with over a billion dollars, and ENTRA1 nearly $500 million, while NuScale investors were left holding the bag.

22. There is no doubt that Defendants (defined below) were aware that ENTRA1 and its principal, Habboush, lacked the experience and resources portrayed to the market. On public conference calls, NuScale's management team discussed at length the due diligence and vetting process that ENTRA1 underwent, as well as NuScale and Fluor's deep-rooted relationship with ENTRA1 and Habboush. In fact, prior to joining the Company, NuScale's CFO, Hamady, worked for Habboush at his family's private investment management firm, the Habboush Group.

23. As a result of Defendants' fraud, NuScale investors have suffered millions of dollars in losses and economic damages under the federal securities laws, which this lawsuit seeks to recover.

## II. NATURE OF THE ACTION

24. This is a securities fraud class action on behalf of all purchasers or acquirers of NuScale Class A common stock between March 3, 2025 and November 6, 2025, both dates inclusive

(the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

25. As a result of Defendants' wrongful acts and omissions as alleged herein, Plaintiffs and the Class purchased or acquired NuScale common stock at artificially inflated prices, suffered significant losses, and were damaged thereby.

## III. JURISDICTION AND VENUE

26. The claims asserted herein arise under and pursuant to §§10(b), 20(a), and 20A of the 1934 Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

27. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act, 15 U.S.C. §78aa.

28. Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District where NuScale is headquartered.

29. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

## IV. THE PARTIES

### A. Lead Plaintiffs

30. Lead Plaintiff IAM National Pension Fund ("IAMNPF") is a multi-employer defined benefit pension plan associated with the International Association of Machinists and Aerospace

Workers. The IAMNPF covers more than 100,000 active participants with approximately $14 billion in assets. As set forth in its previously filed certification, IAMNPF acquired NuScale Class A common stock at artificially inflated prices during the Class Period and was damaged thereby. ECF 20 at 9-10.

31. Lead Plaintiff Local 353, I.B.E.W. Pension Fund ("I.B.E.W.") is a union-sponsored multi-employer pension plan covering members of Local 353 of the International Brotherhood of Electrical Workers in Toronto, Ontario. The I.B.E.W. represents approximately 887,000 active members and retirees who work in a wide variety of fields, including utilities, construction, telecommunications, broadcasting, manufacturing, and railroads. As set forth in its previously filed certification, I.B.E.W. acquired NuScale Class A common stock at artificially inflated prices during the Class Period and was damaged thereby. ECF 20 at 11-12.

**B. Defendants**

**1. NuScale and its CEO and CFO**

32. Defendant NuScale is a nuclear technology company that develops SMR technology for the generation of nuclear power. The Company was founded in 2007 and is incorporated under the laws of Delaware, with its headquarters in Corvallis, Oregon. NuScale Class A common stock trades in an efficient market on the NYSE under the ticker symbol "SMR." NuScale is pre-commercialization, meaning that it has not yet sold any of its SMRs.

33. Defendant Hopkins was, at all relevant times, NuScale's CEO and a member of NuScale's Board of Directors ("Board") since December 2012. Prior to serving as CEO, defendant Hopkins was employed at Fluor from 1989 to 2012, where he held various leadership positions, including serving as group executive for Corporate Development & New Ventures.

34. Defendant Hamady has served as the CFO of NuScale since August 2023. Prior to joining NuScale, Hamady served as the CFO at a United States based finance firm Equify Financial, LLC and at Western Magnesium Corporation. Before Western Magnesium Corporation, Hamady worked for Habboush at the Habboush Group, a private investment management firm, in a senior role.

**2. Fluor and Certain NuScale Directors**

35. Defendant Fluor is a publicly traded engineering, construction, and procurement company based in Irving, Texas. During the Class Period, Fluor was a control person of NuScale as a result of its significant ownership of NuScale common stock (making Fluor the Company's largest single shareholder), its commercial relationships and business arrangements with the Company, and its historical relationship and/or control over members of NuScale's corporate board and executive management.

36. Fluor's relationship with NuScale dates back to at least 2011, when it rescued the Company from insolvency after NuScale's prior investor, The Michael Kenwood Group, LLC, collapsed when federal prosecutors accused it of taking part in a massive Ponzi scheme orchestrated by its majority owner, Francisco Illarramendi, who later pled guilty to defrauding investors of hundreds of millions of dollars.

37. As a September 30, 2011 Exclusivity Agreement entered into between NuScale and Fluor stated: "NuScale has insufficient funds to continue its on-going business operations and, as a result, Fluor has elected to invest significant funds in NuScale at a critical time." As a result of its investment, Fluor became the majority investor in NuScale, holding over 50% of the Company's stock. Fluor proceeded to invest more than $500 million into NuScale and remained NuScale's majority shareholder for more than a decade, until October 2024.

38. As of April 2025, shortly after the Class Period began, Fluor remained NuScale's largest shareholder, possessing 45.3% of the Company's total voting power. In addition, pursuant to business collaboration agreements with NuScale, Fluor retained rights to perform engineering, procurement, construction, and other specified services for NuScale. According to NuScale's Class Period SEC filings, including its March 3, 2025 Form 10-K, NuScale "rel[ies] heavily upon our relationship with Fluor" to "commercialize our NPM and our other products and services."

39. At the start of the Class Period on March 3, 2025, a majority of NuScale's nine-member Board consisted of directors directly installed by and/or otherwise associated with Fluor. According to NuScale's SEC filings, Fluor selected Alan Boeckmann ("Boeckmann"), Alvin C. Collins, III ("Collins"), and Jim Breuer ("Breuer") to serve as NuScale directors. Boeckmann previously served as Fluor's CEO and Chairman, and Breuer and Collins were both senior Fluor executives. As stated in NuScale's 2025 Proxy Statement, filed April 9, 2025, none of these three directors were "independent" "because of their current or prior employment with Fluor."

40. Defendant Boeckmann has served as a member of NuScale's Board since December 2020, and has served as NuScale's Board Chairman since January 2025. Previously, Boeckmann served as Fluor's CEO and Chairman from February 2002 to 2011, Non-Executive Chairman from 2011 to 2012, and Executive Chairman again from May 2019 until his retirement from Fluor in May 2022.

41. Defendant Breuer served as a member of NuScale's Board from December 19, 2023 to May 23, 2025. During that time he was also a member of Fluor's executive management team and served as Fluor's Chief Operating Officer and the Group President of Fluor Corporation's Energy Solutions. On February 17, 2025, prior to the start of the Class Period, Breuer was appointed Fluor's CEO, effective May 1, 2025.

42. Defendant Collins served as a member of NuScale's Board from 2021 to 2026. He joined Fluor in 1994 and, during the Class Period, served as a member of Fluor's executive management team and as Fluor's Group President of Corporate Development and Sustainability.

43. Hopkins, a former Fluor senior executive, was installed by Fluor as a director (and as NuScale's CEO) in 2012 after Fluor became the Company's majority shareholder. According to a December 13, 2012 Fluor press release, David Seaton, Fluor's then CEO, "'asked John [Hopkins] to take on this new challenge of leading NuScale's expansion.'"

44. Kent Kresa ("Kresa"), another NuScale director, served as a member of Fluor's Board with Boeckmann. Kresa's tenure on NuScale's Board began in August 2019, before NuScale became a public company, while Fluor was NuScale's controlling shareholder. At that time, ***every*** NuScale director was a current or former Fluor executive or director. Thus, at the start of the Class Period, five members of NuScale's nine-member Board, a majority, were current or former Fluor executives or directors, all of whom appeared to have been installed by Fluor. Kresa, however, is not named as a Defendant.

45. Defendants Hopkins, Hamady, Boeckmann, Breuer, and Collins are collectively referred to herein as the "Individual Defendants."

46. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of NuScale's periodic reports, press releases, and other public statements, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of NuScale's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company and their access to material, non-public information,

the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and knew that the positive representations being made were then materially false.

### 3. NuScale, Fluor, and Hamady's Class Period Sales of NuScale Common Stock, Totaling over a Billion Dollars

47. As alleged further herein, during the Class Period, NuScale sold over 13 million shares of Company Class A common stock in an "at the market" (or "ATM") offering starting in August 2025 for gross proceeds of ***$475.2 million*** while in possession of material, non-public information regarding ENTRA1, the Company's exclusive global commercialization partner, and its lack of qualifications and capabilities.

48. Shortly after the ATM offering program began, Fluor also made a series of sales to monetize its equity stake in NuScale. Between September 16, 2025 and October 8, 2025, Fluor sold 15 million shares of NuScale Class A common stock while in possession of the same material, non-public information regarding ENTRA1 and its lack of qualifications and capabilities, obtaining ***$604.8 million*** in gross proceeds as a result. Fluor had not previously sold any NuScale common stock into the market for at least the prior five years, if not longer. Although Fluor had been discussing monetizing its stake in NuScale since at least 2022, it waited to start selling down its holdings until the Class Period, when the Company's stock price was artificially inflated by the fraud.

49. Hamady also sold 143,751 shares of NuScale common stock for proceeds of more than ***4 million dollars*** during the Class Period, representing approximately 75% of his NuScale holdings – more than Hamady had sold in 2023 (when he started at NuScale) and 2024 combined. On March 3 and 7 of 2025, Hamady sold 43,126 shares for $685,801. Thereafter, on May 30, 2025, Hamady sold 69,984 shares for $2,246,486. Then, on August 27, 2025, Hamady sold another 30,641

shares for $1,090,513. These Class Period sales were larger than any of Hamady's prior sales. By comparison, Hamady sold no shares in 2023, and in 2024, Hamady sold just 48,081 shares.




50. In all, NuScale, Fluor, and Hamady sold over a billion dollars of NuScale Class A common stock during the Class Period while in possession of material, non-public information regarding ENTRA1.

**4. The ENTRA1 Defendants**

51. Defendant ENTRA1 is a Houston-based, privately held company that purports to be focused on developing, financing, owning, and operating large-scale power generation assets, including for nuclear power. During the Class Period, ENTRA1 served as NuScale's exclusive global commercialization partner pursuant to a series of agreements granting ENTRA1 exclusive rights to commercialize, distribute, and deploy NuScale's SMR technology worldwide.

52. ENTRA1 was founded and is led by defendant Habboush. Habboush previously practiced as a corporate lawyer and ran a private investment management firm, the Habboush Group, started by his father, Riadh W. Habboush. Wadie Habboush has no experience in developing or

operating nuclear power plants and ENTRA1 has never built or operated any power plant. Its Chief Projects Officer ("CPO"), Skip Alvarado, one of ENTRA1's few employees, has worked in the oil and gas industry for decades (a different industry from nuclear power), including for Fluor. Alvarado, however, is not named as a Defendant.

53. ENTRA1 and Habboush are together the "ENTRA1 Defendants." The Individual Defendants, NuScale, Fluor, and the ENTRA1 Defendants are collectively referred to herein as "Defendants."

## V. SUBSTANTIVE ALLEGATIONS

### A. General Overview of the Commercial Nuclear Power Industry

54. In recent years, governments, utilities, and private industry have viewed nuclear power as a potential source of carbon-free electricity. For example, a multi-country initiative was recently launched with the goal of tripling global nuclear capacity by 2050, supporting annual investment in existing and new nuclear facilities, which has increased by more than 50% to over $60 billion in the last several years. This heightened interest has created significant commercial opportunities for companies seeking to develop and deploy next-generation nuclear technologies.

55. Among these next-generation technologies are SMRs, which are designed to generate electricity using smaller, factory-manufactured reactor units that can be deployed individually or combined to meet increasing power demands. The successful commercialization of SMR technology remains dependent, however, upon the ability of developers to finance, license, construct, and operate extremely complex and highly sophisticated energy-generation facilities. Critically, it has yet to be proven that SMRs can scale up and bring energy costs down to a level that makes them economical compared with alternative forms of energy generation.

### 1. Nuclear Power Plants are Among the Most Heavily Regulated Industrial Facilities in the World

56. Given the extreme complexity of nuclear technology and the potentially severe consequences of operational failures, nuclear power generation is one of the most heavily regulated and technically demanding industries in the world. Unlike conventional energy projects, nuclear facilities require extensive federal, state, local, and international oversight throughout every stage of development, construction, operation, and decommissioning.

57. In the United States, the Nuclear Regulatory Commission ("NRC") serves as the primary federal agency responsible for licensing and regulating commercial nuclear reactors and nuclear materials. The NRC's mission is to protect public health and safety, promote the common defense and security, and protect the environment. To satisfy these obligations, the NRC regulates and imposes stringent standards on each stage of a nuclear project's development and operation, including reactor design, site selection, environmental review, construction, quality assurance, emergency preparedness, security, long-term operations, and ongoing and evolving safety compliance. The NRC's review process also involves extensive technical submissions, audits, and public hearings before any nuclear facility may proceed toward construction or operation.

58. The licensing process for a new nuclear facility typically takes ten to fifteen years from initial planning (two to five year planning and licensing phase followed by a six to ten year construction phase), and requires applicants to submit thousands of pages of technical documentation demonstrating that a proposed reactor design can safely withstand both internal and external hazards. Among other things, regulators evaluate a reactor's ability to withstand equipment failures, flooding, fires, earthquakes, extreme weather events, cybersecurity threats, and other high-consequence events. Regulatory reviews also examine environmental impacts, water usage, spent-fuel

management, emergency evacuation planning, and the effects of the plant construction and operation on surrounding communities and ecosystems.

59. There are good reasons for the nuclear industry's extensive regulatory requirements and lengthy review process. Though rare, disasters at nuclear facilities can be catastrophic. Both the Fukushima and Chernobyl power plants in Japan and Ukraine, respectively, experienced core meltdowns, and the Three Mile Island nuclear plant near Harrisburg, Pennsylvania experienced a partial core meltdown. Moreover, while NuScale claims that it "is poised to usher in a new era of clean energy," the process of creating nuclear power is far from "clean." The uranium mining and milling necessary to fuel NuScale's reactors cause water contamination, radioactive waste accumulation, and landscape destruction. Further, SMRs, such as NuScale's, produce two to thirty times the radioactive waste of older nuclear designs, for which there is currently no safe, long-term disposal site. Any community that hosts a nuclear reactor will, therefore, likely be saddled with its radioactive waste for the indefinite future, if not forever.

60. Historically, most operating nuclear facilities were licensed under 10 C.F.R. Part 50, which requires separate approvals for construction and operation in a two-step process. In the 1990s, a one-step licensing process under 10 C.F.R. Part 52 was introduced, where applicants would provide a completely specified design as part of the application and receive a combined construction and operating license. While Part 52 was intended to streamline portions of the licensing process, applicants remain subject to extensive safety, environmental, financial, and administrative review requirements before construction and commercial operation may begin. And while Part 52 was also designed to reduce regulatory uncertainty by certifying reactor designs in advance, that benefit comes at the cost of flexibility, as departures from the approved design often trigger additional layers

of the NRC's review and approval, making on-site modifications more difficult, time-consuming, and expensive.

61. The regulatory environment governing commercial nuclear power is not static. Rather, the NRC continually evaluates and revises its requirements in response to new safety information, operating experience, technological developments, and lessons learned from major nuclear incidents. For example, following the 2011 Fukushima incident in Japan, the NRC undertook a comprehensive review of its regulatory framework and imposed additional safety requirements on United States nuclear facilities, including enhanced mitigation strategies, seismic and flooding assessments, and new equipment and monitoring requirements. These evolving regulatory expectations can require significant design modifications, additional engineering work, and supplemental licensing reviews, increasing both the complexity and cost of developing and constructing commercial nuclear projects. As a result, companies seeking to commercialize nuclear technology must navigate an extensive and technical regulatory process that continues to evolve as new concerns emerge.

62. Accordingly, before a NuScale SMR plant is built in the United States, the plant developer must obtain an NRC construction permit and operating license issued pursuant to 10 CFR Part 50 or a combined license issued pursuant to 10 CFR Part 52. As stated on NuScale's website, the NRC "evaluates the application to verify compliance with regulations and confirm the company has the ***expertise and resources*** required to operate a nuclear facility responsibly." According to NuScale, "***[t]ransparency is essential*** in building trust and ensuring accountability throughout the process." As seen further below, however, NuScale, and ENTRA1 – the Company's "exclusive" commercialization partner – were anything but transparent, and ENTRA1 lacked any expertise in building or operating nuclear facilities.

### 2. Nuclear Plant Development Is Extremely Difficult and Requires Significant Nuclear Experience to Successfully Execute

63. Reflecting the lengthy and ever-evolving regulatory approval process, coupled with the technical complexity of nuclear facility construction, commercial nuclear power projects are among the most complex and capital-intensive infrastructure projects in the world. The successful commercialization of SMR technology is therefore dependent upon the ability of developers to finance, build, and operate these highly sophisticated energy-generation facilities at reasonable costs. Critically, SMR companies, such as NuScale, have not yet demonstrated that they can scale up and bring energy costs down to a level that makes them economical compared with alternative forms of energy generation in the United States.

#### a. Nuclear Plant Construction is Plagued by Cost Overruns and Delays that Undermine Project Viability

64. Only three nuclear reactors have come online in the United States this century. Amid rising competition with cheap natural gas, solar, and wind power, nuclear companies have faced skepticism in the commercial market, with many forced to shutter projects after going billions of dollars over budget. In fact, nuclear plant construction is often characterized as exhibiting "negative learning." That is, instead of getting better at building nuclear plants over time, we're getting worse. Further, plants have gotten radically more expensive, even as technology has improved and the underlying science is better understood.

65. These high costs translate to expensive electricity. In April 2023, Lazard, a financial firm, estimated that the unsubsidized levelized cost of electricity from new nuclear plants in the United States will be between $141 and $221 per megawatt hour. By comparison, a newly constructed utility-scale solar facility with some storage to provide power after the sun sets will produce power at an unsubsidized levelized cost of between $46 and $102 per megawatt hour. Costs

for these technologies have continued to trend in opposite directions: nuclear is going up whereas solar and batteries have become cheaper and are expected to decline further. It is therefore critical for any nuclear plant developer to control costs to remain economically viable, an extremely difficult proposition under any circumstances.

66. Indeed, with nuclear plants, 60%-80% of their electricity cost comes from constructing the plant itself, and United States nuclear power has been consistently hampered by steady and dramatic increases in plant construction costs, frequently over the life of a single project. In the 1980s, for example, several plants in Washington state were canceled after estimated construction costs increased from $4.1 billion to over $24 billion, resulting in a $2 billion bond default from the utility provider. The two Vogtle units recently built in Georgia cost more than twice their initial estimates, rising from approximately $14 billion when construction was approved in 2009, to over $30 billion in 2024, and two South Carolina reactors were canceled after costs rose from $9.8 billion to $25 billion.

67. The technical complexity and regulatory burdens involved with nuclear plant construction and operations have driven a large part of these rising costs and associated delays. According to the International Energy Agency, an intergovernmental organization established in 1974 under the Organisation for Economic Co-operation and Development, nuclear power projects started between 2010 and 2020 have been delayed an average of three years due to their high technical complexity, need for highly trained specialists, strict regulations, high cost, and the necessity of guarding against nuclear accidents, which can be devastating to human life and the environment.

68. The delays and burdens are even worse in the United States. Increased regulation and professional standards have led to more stringent (and costly) manufacturing, testing, and

performance criteria for structural materials such as concrete and steel, and for basic components such as valves, pumps, and cables. The hurdles have led to North America experiencing the longest delays in nuclear power construction globally, at more than six years delayed on average. In fact, the minimum time required to build a plant increased from 4 years in the late-1960s to 8 years in the mid-1970s, with 75% of reactors taking 10 to 15 years to build. Consistent with this trend, the 2 recently finished Vogtle units took more than 14 years to complete.

69. Indeed, a study by the Nuclear Energy Agency, an intergovernmental agency formed in 1958 under the Organisation for Economic Co-operation of Development, looked at nuclear plant cost estimates made from 2010 to 2020 and found that increases in indirect cost are the main driver of nuclear plant cost overruns, with labor making up 80% of indirect costs. Because a large fraction of the cost of a new nuclear plant is the cost of the labor to build it and the related financing costs, both of which are strongly impacted by project delays and rework, effective project management of nuclear plant construction is essential.

70. Thus, according to the National Academy of Engineering ("NAE"), "[w]hile it is vital to demonstrate that advanced reactors are viable from a technical perspective, it is perhaps even ***more vital*** to ensure that the overall plant, including the on-site civil work, can be built ***within*** cost and schedule constraints."

### b. Experience in the Field Is Vital to the Successful Execution of Nuclear Projects

71. As a result of these difficulties in building nuclear plants, the experience of those overseeing such projects is of the utmost importance. As Jukka Laaksonen ("Laaksonen"), former Director General of Finland's Radiation and Nuclear Safety Authority, has stated, "[a] good

company name earned in the past is ***no guarantee*** for success" in building nuclear plants.[2] "***More important***" according to Laaksonen, "is the experience and competence of individuals actually assigned to the project." Thus, Laaksonen explained, in order to avoid delays and difficulties during the project's implementation, the plant developer "***must***" have "***knowledge and experience*** in all technical areas relevant for ***nuclear*** safety: civil, mechanical, electrical and [instrumentation & control] engineering," and "***knowledge and experience*** on ***nuclear*** technologies ([*e.g.*,] water chemistry, nuclear fuel, reactor physics, thermo-hydraulics and safety analysis)."

72. These precepts are well understood in the nuclear field and applicable at the earliest stages of any nuclear project. At the initial planning phase, the nuclear plant developer defines the project scope, method of financing, delivery method, cost, and schedule. To successfully fulfill these key functions, a 2023 report published by the NAE, entitled "Laying the Foundation for New and Advanced Nuclear Reactors in the United States" ("2023 NAE Report"), states that the developer "***must*** have a strong ***in-house*** project team," and that the team "should include substantial technical, engineering, and affiliated personnel," including "***150-200 staff*** for a major project, excluding administrative support."[3]

73. "[A]bsent a strong internal staff," according to the 2023 NAE Report, "the owner typically does ***not*** have the capacity ***to manage or even evaluate the risks***" present in nuclear plant projects. Indeed, as Laaksonen has explained, "[m]anagement of work conducted by the sub-contractors is a challenge of its own." In fact, as further stated in the 2023 NAE Report, "[h]istorical

---

[2] Finland gets approximately 40% of its power from multiple nuclear reactors that the country has built over the years, with its most recent reactor starting operations in 2023.

[3] The 2023 NAE Report is a "Consensus Study Report," meaning it provides evidence-based consensus on the study's statement of task by an authoring committee of experts. Each report has been subjected to a rigorous and independent peer-review process and it represents the position of the National Academies on the statement of task.

evidence suggests that severe cost and schedule overruns are the ***result of a lack of these in-house capabilities by the primary owner and operator***." Accordingly, a lack of project management experience for nuclear plant construction hinders delivering new plants on time and on budget, resulting in failed projects.

74. The International Atomic Energy Agency ("IAEA"), the world's central intergovernmental forum for scientific and technical cooperation in the nuclear field, has also explained that, aside from plant construction, "[o]ne of the most ***critical requirements*** for safe and reliable nuclear power plant (NPP) operations and maintenance is the availability of sufficient numbers of ***competent personnel***. Experience has shown that, in addition to the quality of the design and equipment, personnel competence is ***essential*** to ensure safety and reliability," and "[t]he operating organization is responsible for the recruitment and training of NPP personnel and for the definition of competence levels." Thus, it is no surprise that the IAEA states that "[w]hether it is to ensure diligence or oversight in design, manufacture, construction or operation, new projects ***require*** the deployment of highly trained and motivated nuclear workers with sufficient levels of ***nuclear experience and expertise***."

75. As a result, it was of paramount importance to NuScale investors that the Company collaborate with qualified and highly experienced partners in the field of nuclear power plant construction and operation in the initial sale and deployment of the Company's NPMs.

**c. New Regulatory Pathways and Modular Reactor Designs Have Not Reduced the Cost or Complexity of Building Nuclear Power Plants**

76. As described above, in the 1990s, a new one-step licensing process was put into place, where applicants could provide a completely specified design as part of the application, and receive a combined construction and operating license. However, this change has not led to the

efficiencies sought. Because the design was already approved, any deviation is now required to go through several additional levels of approval, making it even harder to make on-site changes.

77. For instance, the recent Vogtle Unit 3 and 4 reactors were permitted under the one-step licensing process. These reactors all used the then-new AP1000 reactor from Westinghouse Electric Company, which, like NuScale's NPM reactor, was designed to be much simpler than previous reactors, and prefabricated and installed on-site in modules, supposedly reducing the requirements for on-site labor. Westinghouse Electric Company itself claimed, like NuScale, that plant costs and construction schedules would benefit directly from the great simplifications provided by the design and because of modular construction techniques.

78. However, the initial design of the AP1000 had significant constructability issues. The smaller size of the design forced systems and components closer together, making them difficult to install and requiring frequent design changes. There also were issues with the prefabricated modules, which were often behind schedule, out of spec, and requiring significant rework – one downside of prefabrication is that problems that occur on-site are more difficult to fix. The added hurdles for making on-site changes from the one-step licensing process exacerbated all these issues.

79. The Vogtle project, which Fluor worked on and was later replaced by another construction company, ultimately suffered from severe delays and massive cost overruns. Originally budgeted for $14 billion with target completion dates of 2016 (Unit 3) and 2017 (Unit 4), the final cost ballooned to over twice that – $36.8 billion – and commercial operation did not commence until 2023 and 2024, 7 years late. Thus, factory-fabricated modularization does not necessarily solve problems; rather it can introduce widespread issues during the manufacturing process that lead to delays and increased costs. Accordingly, an unexpected and unidentified design flaw discovered in a

key component of a highly standardized SMR can cause extended and expensive outages, repairs, and design changes.

80. In addition, it has typically been assumed that first-of-a-kind plants will be more expensive, but that re-using the same design on future projects, as NuScale proposes to do, will allow developers to benefit from learning-curve efficiencies that will reduce costs. But studies have found that this has not occurred in the United States, likely due in part to frequently changing regulations. As a result, it does not matter how standardized a design is if it must be changed on future projects to meet ever-changing regulatory requirements.

81. In fact, according to M.V. Ramana, the Professor and Simons Chair in Disarmament, Global and Human Security at the School of Public Policy and Global Affairs at the University of British Columbia in Vancouver, Canada, "[h]istorically, . . . most of the early small reactors built in the United States shut down because of adverse economics." Even Chris Womack, the CEO of Southern Company, the company that finished building the two Vogtle reactors in Georgia, stated: "I'd also say we're going to celebrate what we've done at Vogtle for a very long time before we give any consideration to any more [nuclear]." The combination of these challenges, among others, makes SMR commercialization a particularly difficult challenge, further highlighting that only experienced and well-resourced organizations should attempt to undertake these projects.

## B. NuScale Power

### 1. After Nearly 20 Years, NuScale Has yet to Sell a Single Nuclear Reactor

82. Founded in 2007, NuScale is a nuclear technology company focused on small modular reactors. NuScale's core technology, the NPM, is an SMR designed to generate energy within a broader power plant, configured with four, six, or twelve NPMs. The Company claims its NPMs have several advantages over traditional large-scale nuclear facilities, including enhanced

economics, scalability over time, a simplified design, and a smaller footprint. According to NuScale, it is "[t]he Future of Advanced Nuclear Energy," and its self-proclaimed "NuScale Advantage" includes the promise of "***36-Month Construction***" because the Company's "NPMs are factory built and our plant design includes many off-the-shelf components, reducing construction timelines and cost."

83. NuScale started trading publicly on May 3, 2022, following a merger with special purpose acquisition company (or "SPAC") Spring Valley Acquisition Corp. Since its founding, NuScale has spent over $1.8 billion to develop its SMR technology, funded by a mix of SPAC money, government grants, and public and private investments. NuScale, however, has not commercialized or sold any NPMs. Nor has it entered into any binding contracts with customers to deliver its NPMs. In other words, despite a market cap that reached a high of $17 billion during the Class Period in October 2025, NuScale has not sold a single reactor in its 19 years of existence.

84. NuScale has generated some revenue by providing engineering and licensing fees and services, including to Fluor, which until recently was NuScale's largest shareholder. Those revenues, however, have been relatively small compared to the Company's overall expenses. As a result, NuScale is not profitable and has incurred significant losses since its inception. According to the Company's SEC filings, NuScale carries "substantial overhead expenses" and does not expect to generate any "meaningful revenue" ***until*** it is able to "finalize development of and commercialize [its] SMR technology," which, to date, it has been unable to do. As a result, NuScale expects that it "will require additional future funding" in order to continue its business. The launch and commercialization of NuScale's NPMs is therefore key to the Company's viability and highly material to the Company's investors.

### 2. No Stranger to the Difficulties of Nuclear Plant Development, NuScale's Own Flagship Project Fails Due to Runaway Costs, Sending the Company into a Tailspin

85. NuScale itself is well acquainted with the difficulties of developing viable nuclear power projects. According to commentary in the Oregon Capital Chronicle:

> A decade ago, NuScale, the Oregon-based small modular nuclear company born at Oregon State University, was on a roll. Promising a new era of nuclear reactors that were cheaper, easier to build and safer, their Star Wars-inspired artist renditions of a yet to be built reactor gleamed like a magic bullet.
>
> As of last year [2023], NuScale was the furthest along of any reactor design in obtaining Nuclear Regulatory Commission licensing and was planning to build the first small modular nuclear reactor in the United States. Its plan was to build it in Idaho to serve energy to a consortium of small public utility districts in Utah and elsewhere, known as UAMPS.
>
> This home-grown Oregon company was lauded in local and national media. According to project backers, a high-tech solution to climate change was on the horizon, and an Oregon company was leading the way. It seemed almost too good to be true.
>
> And it was.
>
> Turns out, NuScale was a house of cards. The UAMPS project's price tag more than doubled and the timeline was pushed back repeatedly until it was seven years behind schedule. Finally, UAMPS saw the writing on the wall and wisely backed out in November, 2023.

86. After over ten years of development, the Company's "flagship" project, which was supposed to serve as NuScale's proof-of-concept for its commercialization strategy, was dead. First announced in 2015, the UAMPS project initially involved constructing 12 reactor modules capable of generating 600 MW, with the aim of starting operations "around 2023," and at an "overnight cost" of $3 billion. In 2018, NuScale announced a design modification with each module now producing 60 MW of electricity, or 720 MW for the whole plant, claiming this would lower the cost on a per kilowatt basis from an expected $5,000 to approximately $4,200. However, the estimated cost of the project rose to $4.2 billion in 2018, then $6.1 billion in 2020, and finally $9.3 billion in 2023, after it

was scaled down to 462 MW in 2021. According to M.V. Ramana at the University of British Columbia, "[i]n the end, the costs were clearly too high for UAMPS members to bear."

87. The UAMPS failure was a severe blow to the Company. NuScale's stock plunged, its CEO Hopkins sold off most of his stock shares, and the Company laid off nearly a third of its workforce. As analysts from Wells Fargo described in a November 9, 2023 report, "[s]hares are down ~35% today following the news that NuScale & UAMPS have agreed to terminate the CFPP, NuScale's flagship project." The news, Wells Fargo wrote, was a "major blow" and "raises concerns about NuScale's ability to successfully commercialize the company's SMR technology." The analysts also noted that "NuScale continues to pursue other customers but does not yet have any other firm commitments."

### 3. Seeking to Redeem Itself, NuScale's Relationship with ENTRA1 Comes into Focus, Accompanied by the Promise of Imminent Customer Contracts

88. Prior to the start of the Class Period, NuScale announced on September 9, 2022, that it had entered into a commercialization partnership with ENTRA1 and the Habboush Group. NuScale and its executives claimed that this partnership would help the Company take its NPM technology from the development stage to deployment, enabling NuScale's NPMs to serve as meaningful, revenue-generating components in power plants. As a "commercialization partner" for the Company's NPMs, ENTRA1 purportedly sought to deploy NuScale's products by constructing energy generation facilities that contain and use NPMs, and was tasked with finding customers and managing plant financing, development, and operations. This would serve as one channel of NuScale's commercialization efforts.

89. As NuScale explained, ENTRA1, not NuScale, would be the one building these plants with NuScale's NPM technology inside. For example, NuScale's Form 10-K filed with the

SEC on March 3, 2025, the Company explained that it had "aligned with ENTRA1 as its commercialization/developer partner for NuScale SMRs" and that "ENTRA1 will ***develop and construct new build energy plants*** that will be designated/identified as ENTRA1 Energy Plants™ with NuScale SMRs inside."

90. At the start of the Class Period, however, the nature of NuScale's relationship with ENTRA1 changed. ENTRA1 was no longer merely another one of NuScale's partners. Rather, in its March 3, 2025 Form 10-K, filed after market close, NuScale began telling investors for the first time that its "commercialization strategy ***relies heavily*** on our relationship with ENTRA1." And in a March 3, 2025 press release reporting, after market close, on NuScale's fourth quarter and full year 2024 results, and again during the 4Q24 earnings call that followed, Hopkins sought to reassure investors that, over a year after the UAMPS project had collapsed, business was finally coming, and coming soon due to ENTRA1.

91. In the press release, Hopkins stated that "'[a]longside our developer partner ENTRA1 Energy, we are in ***advanced commercial dialogue*** with major technology and industrial companies, utilities, and national and local governments.'" He then further elaborated during the March 3, 2025 earnings call, telling investors that "ENTRA1 Energy Plants powered by NuScale technology are ***primed for immediate commercial development***." According to Hopkins, "[c]oupled with our ENTRA1 development partnership, NuScale's SMR technology is ***poised to move to exploding demand*** for clean energy across multiple sectors." When analysts asked NuScale to "walk us through some of the items that you and ENTRA1 need to work through with prospective customers before being in a position to announce a project," Hopkins indicated that deals were nearly in hand, with the only steps left to take being "predominantly around the negotiation and finalization of long-term power purchase agreements."

92. As NuScale's March 3, 2025 Form 10-K stated, "[t]he ENTRA1 Solution is a '***one-stop-shop***' integrated offering to deployment that proactively ***combines facility design and construction, development, financing, licensing, manufacturing and operations*** in a framework that delivers new dispatchable, carbon-free baseload generation capacity ***within acceptable cost, time and risk profiles*** for utilities, off-takers and stakeholders." The Form 10-K also referred investors to NuScale's website, which described ENTRA1 as "a ***global powerhouse*** in the energy sector" and that its "capabilities extend to providing bespoke ***plant development, ownership, and operating*** mechanisms."

93. Following these March 3, 2025 disclosures, made after market close, NuScale's stock price increased over 11.5%, closing at $17.23 per share on March 4, 2025.

**a. NuScale Puts All Its Eggs in One Basket, Entering into an "Exclusive" Partnership with ENTRA1**

94. Two months later, NuScale's relationship with ENTRA1 continued to deepen. In NuScale's May 12, 2025 Form 10-Q filed with the SEC after market close, the Company disclosed that on May 7, 2025, NuScale had entered into an amended and restated Strategic Alliance Agreement solely with ENTRA1. Pursuant to the agreement, ENTRA1 would serve as NuScale's "exclusive global strategic partner for a period of 20 years" and hold "exclusive rights for the worldwide commercialization, distribution, sales, and development of NuScale LLC's products, services and power plants." As analysts from Guggenheim Securities would later state, "[w]e believe, based on those public pronouncements as well as others, that it is fair to say that ENTRA1 plays a ***pivotal role*** in [NuScale's] future."

95. During the May 12, 2025 earnings call that followed that day to discuss the Company's 1Q25 results, NuScale continued to tout its relationship with ENTRA1 and the business it would bring. In fact, the Company told investors to expect that a firm order for NuScale's NPMs

would come in that year, with Hopkins stating that he "remain[ed] confident that the growing interest in our technology and its critical use cases, as well as NuScale's distinct competitive edge in module manufacturing and readiness, will result in a firm customer order during 2025."

96. Hopkins continued that "[i]n collaboration with our exclusive commercialization partner, ENTRA1 Energy, we are in various stages of discussions with potential customers, both here in the US and abroad." According to Hopkins, the Company's "focus, right now, is to get closure on near-term contracts," and as he stated explicitly, "[w]e are no longer chasing or now seeing MOUs," instead NuScale was "actually in the process of submittal and negotiating term sheets." Hopkins also told investors that the Company was beyond discussions about cost estimates; "[n]ow, it's discussions of getting long-term Power Purchase Agreements negotiated in place," *i.e.*, long-term contracts from customers buying energy produced by NuScale's NPMs.

97. Following NuScale's May 12, 2025 disclosures, which occurred after market close, the Company's stock price increased over 20%, rising from a closing price of $17.79 per share on May 12, 2025, to $21.64 per share on May 13, 2025. The stock price continued to rise thereafter, nearly doubling to $40 per share in June 2025, just one month later.



98. By the following month of July 2025, NuScale's stock price was already reaching near Class Period highs of over $50 per share.

**b. NuScale and ENTRA1 Subsequently Fail to Deliver a Final Customer Agreement**

99. Despite NuScale's prior representations since March regarding the "advanced" commercial dialogue and customer discussions, and that the Company's technology was "poised to move to exploding demand," no agreement or substantive update was announced during the following quarter. Instead, on NuScale's August 7, 2025 earnings call, which was held after market close to discuss the Company's 2Q25 results, Hopkins continued to claim that NuScale was "getting inundated" with customers, stating: "As it relates to customers, we're getting inundated now. We're focused, as I said, with our resources working with our developer partner ENTRA1 on two or three major customers that – and we're still forecasting having what I call hard contracts in place by the end of this year 2025."

100. The Company's stock price reacted negatively, dropping nearly 12%, from $44.68 per share on August 7, 2025, to $39.35 per share on August 8, 2025. The disclosure acted as a partial corrective disclosure, as the market began to learn that ENTRA1's capabilities, and therefore its ability to finalize nuclear power plant development deals, had been overstated. As Citi analyst Bagri explained in an August 8, 2025 report, "[w]e expect a negative reaction due to," among other things, that NuScale released "no incremental updates on domestic customer contract."

**c. ENTRA1 Announces a Non-Binding Agreement with the TVA and a Highly Unusual Payment Scheme with NuScale**

101. A month later, NuScale's reliance on ENTRA1 as its exclusive commercialization partner appeared to be validated when, on September 2, 2025, ENTRA1 and the TVA, a quasi-governmental utility that spans seven states, jointly announced an agreement to develop power plants

to provide the TVA with up to six gigawatts of new nuclear power generation. ENTRA1 lauded the "[c]ollaborative [a]greement" as the "largest . . . in U.S. [h]istory," and stated its intention to use NuScale's SMRs inside the planned energy facilities.

102. NuScale also publicly applauded the announcement, hailing it as a "landmark agreement" and a "historic program." The "collaboration," however, while potentially large, was also ***non-binding*** – no power purchase agreement was signed – and as reporters from Politico later noted, the announcement was particularly "light on details about the timeline" and "where Entra1 will locate its plants." Similarly, as Citi analyst Bagri later wrote in an October 20, 2025 report, "[b]ased on our conversations, TVA has indicated that they remain in early stages and finalization could take years, with no guarantee of completion." The TVA agreement was, indeed, nothing more than an agreement to continue discussing potential plants, and notably, in the past, NuScale had entered into at least 15 prior memoranda of understanding, none of which resulted in orders for NuScale's reactors.[4]

103. On the same day that the TVA agreement was announced, September 2, 2025, NuScale also announced that its subsidiary, NuScale Power LLC, had entered into a PMA with ENTRA1, pursuant to which NuScale would be required to provide ENTRA1 with a contribution payment in the range of $35 million to $55 million for every NPM placed in an ENTRA1 power plant.

---

4 NuScale would also later issue a press release on October 29, 2025, congratulating ENTRA1 on "being positioned" to receive $25 billion under a $550 billion "U.S.-Japan Framework Agreement." This framework, however, was just another memorandum of understanding, not a signed contract, and, according to one White House official quoted by Politico, the agreement was only a "'first step of interest,'" and that any eventual allocation of funds would need to be approved by a committee made up of both U.S. and Japanese officials.

104. The PMA further provided that the contribution payment would be disbursed to ENTRA1 in tranches triggered by certain developmental milestones, specifically: (i) 15% of the contribution disbursed upon the execution of a non-binding term sheet with a third party; (ii) 35% of the contribution disbursed upon execution of a power purchase agreement with a third party in connection with the deployment of an NPM in an energy project; and (iii) 50% of the contribution disbursed upon execution of an agreement to purchase or deploy NPMs.

105. Following these announcements, scrutiny of both the PMA and ENTRA1 understandably increased. As analysts from RBC stated in a September 15, 2025 report, "NuScale has effectively put 'all its eggs in one basket' with ENTRA1" and as a result, "[p]roject execution will be critical to NuScale's long-term success." The RBC analyst explained that "[a]s exclusive developer for the NPM, NuScale's ***future success is tied to ENTRA1's reputation and ability to execute on project development***." The analysts from Barclays concurred in a September 29, 2025 report, noting "ENTRA1 will be responsible for securing offtakers and so the success of NuScale does lie in the hands of how well ENTRA1 is able to land deals."

106. Despite this, as the RBC analysts also noted in their September 15, 2025 report, the market still had "limited insight into ENTRA1's track record (company website appears to ***lack basic information*** such as management team)" and even "web searches for the company's transaction history yield ***limited results***." As a result, the RBC analysts "wonder[ed] about [ENTRA1's] ability to capital raise and develop multiple projects at once." And another analyst at BNP Paribas wrote in an October 21, 2025 report that "[d]ebates since [the PMA announcement] have been ***what is ENTRA1***?" and that "[l]imited answers have led to wandering investor imaginations."

107. Following the concurrent September 2, 2025 PMA and TVA announcements, analysts also began to parse the potential consequences for NuScale. Analysts, including from Bank of America in a September 3, 2025 report, figured that "the implied 72 modules" in the TVA agreement "would mean a range of $378-$594M in ***non-refundable*** payments are required from NuScale near-term as initial capital for ENTRA1's development." Bank of America viewed this "capital outlay as a risk for NuScale, given that if the projects stall there might ***not*** be recovery." Echoing this concern, an analyst from TD Cowen likewise wrote in a September 3, 2025 report, "if TVA or alternate projects do not reach" a final investment decision, then "it would appear NuScale ***could have no recovery***." Indeed, as NuScale's February 26, 2026 Form 10-K subsequently confirmed, if ENTRA1 failed to generate future projects, the payments would be "unrecoverable."

108. The September 2, 2025 TVA and PMA announcements, however, were unclear as to whether NuScale actually owed ENTRA1 that massive ~$500 million payment under the PMA at that time – an uncertainty that analysts began highlighting thereafter. For example, as an analyst from Canaccord Genuity stated, after market close in a September 2, 2025 report, he believed that the "Tranche 1" payment was "likely achieved" with the TVA agreement. The Citi analyst, in a September 3, 2025 note, similarly "calculat[ed] a ~$500mm contribution from NuScale to ENTRA1 ***after*** the non-binding agreement ***is*** signed" – indicating he did not believe that such an agreement had been signed at that time – and that "[t]o fund this, NuScale has cash on the balance sheet and a $500mm ATM program in place."

109. Further confirming the uncertainty surrounding whether the $500 million payment had already come due, the Citi analyst continued to appear unsure whether the payment terms had been triggered, writing in a later report on October 20, 2025, that, "***if*** a non-binding contract is signed, SMR ***may*** be required to pay ~$500mm to ENTRA1, which will require outside capital."

The uncertainty was unwelcome news for investors, as NuScale did not then have sufficient capital on hand to fund a $500 million payment to ENTRA1, which would mean the Company would be forced to resort to the above referenced dilutive "at the market" offering to raise the additional funds, all in return for a non-binding agreement that guaranteed nothing.

110. Moreover, following an additional "catch-up" conversation with NuScale management, the Citi analyst called into question NuScale's prior commitment to deliver a signed NPM contract in 2025, writing in a September 3, 2025 note: "Timing of a [power purchase agreement] is uncertain and there is no clarity if a contract will be signed by YE." The Citi analyst would ultimately be proven correct as even today, neither ENTRA1 nor NuScale have signed a power purchase agreement or contract for the purchase of the Company's NPMs.

111. When analysts and the market put these details together following the announcement of the TVA agreement, the reaction was decidedly negative. Although NuScale's stock price initially rose following the announcement of the purportedly positive TVA agreement, it fell shortly thereafter as the market digested the news, including those analyst reports analyzing the PMA and its implications for NuScale issued after market close on September 2 and on September 3 of 2025.

112. Following this news, NuScale's stock price fell 10.9%, from $40.42 per share on September 3, 2025, to $36.03 per share on September 4, 2025. As analysts from Barclays explained in a September 29, 2025 report, the TVA announcement "resulted in a spike in the share price but then traded lower as details about the milestone payments were released." The disclosures acted as another partial corrective event as the market continued to learn that ENTRA1's capabilities, and therefore its ability to finalize and execute on nuclear power plant development deals, had been overstated, and that, despite this, NuScale could ***still*** be required, under a shockingly one-sided arrangement, to make a massive $500 million irrevocable payment to ENTRA1 for ***nothing*** in

return. Indeed, as Citi analyst Bagri later told Politico reporters, it is "somewhat unusual" that NuScale is paying ENTRA1 "such a large amount, and that too, for a non-binding agreement."

113. Because the PMA payment "structure lack[ed] the transparency," as analysts from RBC later put it, questions continued to abound. Accordingly, analysts, like those at UBS in a September 3, 2025 report, "remain[ed] cautious" as they "await[ed] further clarity on deal terms and note[d] the non-binding nature of the agreement." Analysts, however, would not have the opportunity to clarify these issues, and get answers to their questions regarding ENTRA1, until the upcoming November 6, 2025 earnings call with NuScale management.

114. In the meantime, analysts continued to raise new concerns regarding the PMA and its implications for NuScale. RBC described in its September 15, 2025 report that the PMA did not incentivize ENTRA1 to actually build any NuScale power plants on time or within budget, stating "agreements such as the PMA solely incentives the execution of a commercial agreement and an equipment purchase order," noting that they would "like to see something that ensures accountability for completing the project on time and on budget." BNP Paribas's October 21, 2025 report found that "upon our careful modeling (and combing thru nuances of the arrangement)" the PMA payments "strangle[] future FCF [future cash flow]." And, as the Citi analyst concluded in an October 20, 2025 report, "[w]e believe the market is giving too much credit for this deal, as the timeline will likely be longer than expected and the capital needs could weigh heavily especially since the deal isn't guaranteed."

### C. Investors Learn ENTRA1 Is Really "Just a Couple of Guys" and Has Never Built Anything, Let Alone a Nuclear Power Plant

115. After market close on November 6, 2025, NuScale issued a press release confirming that its general and administrative expenses had increased by $502 million – over 3,000% – during its third quarter, due largely to a $496 million payment that NuScale owed ENTRA1 due to the TVA

agreement. By comparison, NuScale previously had just $17 million in general and administrative expenses in the prior year period. As a result, NuScale's quarterly net loss rocketed to $532 million, up from $46 million in the prior year period.

116. And, as Hopkins later explained during the corresponding 3Q25 November 6, 2025 earnings call that occurred later that day, NuScale's total milestone payments to ENTRA1 could potentially exceed more than $3 billion due to the 72 NPMs contemplated by the TVA agreement. Analysts, unsurprisingly, peppered NuScale with questions regarding ENTRA1 and the PMA during the call.

117. Analysts focused on ENTRA1's qualifications and experience, as this information was highly material to investors given ENTRA1's status as NuScale's exclusive commercialization partner. As an analyst from Guggenheim Securities pointedly asked: "But I'm trying to understand, has ENTRA1 ever built or owned or operated ***anything***?"; before repeating: "I'm trying to understand where the actual operational capabilities and history of ENTRA1 are."

118. In response, Hopkins attempted to evade the questions by referring to the Habboush Group's (an entirely separate entity) "over 45 years" of experience:

> Yeah, I can start. They're an independent global energy company, and they have – to your point, over 45 years as [Habboush] [G]roup, years of experience, delivering large-scale energy and infrastructure projects worldwide. In fact, part of the due diligence we went into the program was looking at their extensive knowledge of building coal-fired plants, combined cycle plants.
>
> So they've had a lot of – it's not – it's a family name that is not well known in the industry, but they've had significant experience in building these plants globally.

119. As part of his answer above, Hopkins implicitly conceded that neither ENTRA1 nor its principals had any nuclear experience, explaining that "part of the due diligence we went into the

program was looking at their extensive knowledge of building coal-fired plants, combined cycle plants." No mention of nuclear was made.

120. The Guggenheim Securities analyst, however, pressed further, stating: "Can I follow up here? It sounds to me like you're talking about [Habboush] Group, which is fine. There's ***no*** information about any projects on ENTRA1, that ENTRA1 has done ***at all***." The analyst then asked, point blank: "Are you telling me that ENTRA1 has built and operated projects? And I guess it's still what because there's ***no*** information about any of them on their website."

121. In response, Hamady tacitly confirmed that ENTRA1 had never built or operated any projects, and that NuScale was rather referring only to the prior experience of ENTRA1's principals at ***other*** companies, stating: "Got it. Let me – if I may. Yeah, so we are talking about the principles [*sic*] of ENTRA1." Hamady then contradicted the Company's prior statements in an about-face, stating that ENTRA1 would not actually be "out there building the power plants," an implicit concession that ENTRA1 did not have the ability to do so. Instead, Hamady said that ENTRA1 would be serving "to coordinate projects, to bring in partners, to get deals and the partners they bring in that can execute." But the Company previously stated, at the start of the Class Period, that ENTRA1 would "construct new build" nuclear plants and that this was specifically part of the ***ENTRA1 "solution"*** being offered to solve NuScale's commercialization problem.

122. In connection with ENTRA1, analysts also questioned the PMA. During the November 6, 2025 earnings call, an analyst from TD Cowen, referencing the initial $500 million payment from NuScale to ENTRA1 under the PMA, noted "that's a lot of dollars," and asked the Company: "Could you maybe go through a little bit more about what ENTRA1 is going to use that money for and kind of how it helps move the project forward." But Hamady had no answer, vaguely

telling investors: "I think the short answer is that ENTRA1 pushes that money into project development," conceding "***I don't have a source and uses to share***."

123. The $500 million payment, however, substantially exceeds what would be expected for site preparation work, license application preparation or preliminary site development activities, and as analysts from RBC wrote in a November 7, 2025 report after the earnings call, the PMA's payment "structure ***lacks the transparency*** that we believe investors would appreciate."

124. It was also unclear when NuScale would receive return payment from ENTRA1 under the PMA (if ever). As an analyst from Goldman asked during the November 6, 2025 earnings call, "I guess the big question that we all have on our mind is when does NuScale get paid from ENTRA1?" Analysts also wanted to know "what's the timeline for at least recapturing the $3 billion plus you would have paid to ENTRA1 . . . ?" Hamady gave another non-answer, stating "once that engine starts running, once we start moving projects through the pipeline (inaudible) the pipeline, those PMA payments will become self-funding."

125. Analysts were plainly unsatisfied with the Company's responses, with the Goldman analyst stating in reply on the earnings call, "we're all searching for more details, but we'll take some of this offline." Canaccord Genuity similarly wrote in a November 6, 2025 report that was published after the earnings call, that "we would appreciate more specific insight into a number of questions: what is the nearly $500M paid to ENTRA1 during the quarter going to be used for specifically?" and "[w]hy is ENTRA1 NuScale's exclusive developer, while NuScale is ***not*** Entra1's exclusive technology partner? Questions abound."

126. Other analysts probed those same terms, as well, with one from Iceberg Research – which claims to identify "substantial earnings misrepresentation and accounting irregularities in financial statements issued by public companies," often taking short positions in the companies

covered – writing in a November 14, 2025 report, "[c]onsidering the financial assistance that ENTRA1 receives [from NuScale], you would expect NuScale to be the exclusive supplier of reactors, ***but that is not even the case***. ENTRA1 can buy reactors from ***any*** supplier . . . they want: 'ENTRA1 retains sole and full discretion to select, contract with, or purchase from NuScale.'"

127. A November 7, 2025 report by Barclays summarized the call, describing that "NuScale's 3Q25 call was dominated by questions around the TVA/ENTRA1 agreement, the mechanics and implications of the Partnership Milestone Agreement (PMA), ENTRA1's credentials, Fluor's planned exit, and the company's evolving capital needs and project pipeline," leading to "more questions than answers." In particular, the report noted that "ENTRA1's background draws scrutiny" with many analysts "rais[ing] questions about ENTRA1, as the company is not well known in the industry and lacks a sophisticated website or public record of completed projects." As a result, "analysts ***pressed [NuScale's] management on ENTRA1's credentials***" because "the company's background and track record are ***difficult to verify***, and that management had ***previously described ENTRA1 as having 45 years of experience***."

128. Indeed, according to Barclays, "confusion around ENTRA1's identity and capabilities surfaced repeatedly throughout the call, with several analysts ***seeking more transparency on the developer's operational experience*** and role in the TVA partnership." Likewise, analysts from Canaccord Genuity wrote that, following the November 6, 2026 earnings call, "it was clear the market ***demands greater clarity around ENTRA1***, specifically, greater specificity regarding the company's ***project execution experience***." Even Hamady acknowledged this during the November 6, 2025 earnings call, admitting that "the market continues to struggle with this idea of who ENTRA1 is and what they've done."

129. On this news, the price of NuScale's Class A common stock declined more than 12.4% over a 2-day trading period, from $32.46 per share on November 6, 2025, to approximately $28.43 per share on November 10, 2025 (the next trading day).

130. Guggenheim Securities then published a report on November 14, 2025, confirming ENTRA1's lack of experience and capabilities, further undermining Defendants' Class Period claims. The report criticized NuScale for its lack of transparency regarding ENTRA1, describing the Company's representations regarding ENTRA1 as "***problematic***," stating:

- We do not think [NuScale] has been as clear regarding ENTRA1 as it could have been . . . . ***Nowhere*** on [NuScale]'s website, or ENTRA1's website, or press materials regarding the TVA relationship, is Mr. Habboush's name or the Habboush Group mentioned. As recently as last week's conference call, [NuScale] management was ***still*** characterizing ENTRA1 as "an independent global energy company," although the team ***backtracked*** following some ***additional analyst questions***. Overall, we think that [NuScale]'s communications regarding ENTRA1 have been ***problematic***, ***particularly*** with regards to the Habboush Group. Our assessment contributes to how we have approached valuing [NuScale]'s stock.

131. Based on the analysts' own independent checks, the report described ENTRA1 as a "3-year old company that has ***never built, financed or operated anything***." The report stated that a review of available information about ENTRA1 revealed "***no*** information regarding the company's history, management team, size or capitalization" and just "***3 employees and 1 investor*** as of the writing of this note, notably CEO and Chairman Wadie Habboush." According to the analysts, even "[a] message that we sent to [ENTRA1]'s contact point on the website has gone ***unanswered***." The report stated that a "more accurate description of ENTRA1" than that provided by Defendants "would be that it is an entity supporting the activities of a single individual, specifically Mr. Habboush."

132. As Politico later reported, the Guggenheim Securities analyst, Joe Osha, "***took issue*** with how NuScale has characterized Entra1 as a 'global energy company' in recent press releases

and investor calls discussing their partnership. '***In reality, it really just looks like it's a couple of guys***,' Osha said in an interview."

133. Also on November 14, 2025, analysts at Iceberg Research published a report highly critical of NuScale's relationship with ENTRA1. The report built on the critiques levied by other investment analysts and stated that, based on its own research, ENTRA1 appeared to share an office with NuScale, "rais[ing] questions whether the contract was signed at arm's length and whether funds are being siphoned out of NuScale."

134. As the Iceberg Research report stated: "The small size of ENTRA1 is reflected in its address: a WeWork office in a Houston tower where WeWork occupies the 21st floor. . . . But even more disturbing is the fact that this address is exactly the ***same*** as the NuScale Houston address." "In other words, NuScale wants to sell 72 reactors to a company that is located at its own address," Iceberg Research wrote, while "CEO John Hopkins has consistently reduced his NuScale holdings to zero."

135. The Iceberg Research report further noted that, even if investors were to rely on the purported experience of the Habboush Group in assessing ENTRA1's qualifications, "Habboush has no experience in the nuclear industry" and the "opacity of the group" are "not going to help convince the regulators and the citizens of conservative states where TVA operates (Tennessee, Alabama, Mississippi, Kentucky, Georgia, North Carolina, and Virginia)." Further, the Habboush Group itself appears to have limited operations. The Iceberg Research analyst "found fewer than 15 employees on LinkedIn that could be currently connected to the Habboush Group," and "[t]he [Habboush] website is as empty as ENTRA1's." Not a single project is listed, past or present. Also like ENTRA1, the Habboush Group's address was linked to a workshare office, similar to WeWork – "a Regus office in New York."

136. The price of NuScale Class A common stock continued to fall after the end of the Class Period, dropping to just $17 per share by November 21, 2025 – more than 70% below the Class Period high of more than $57 per share – causing Plaintiffs and the Class to suffer significant financial losses and economic damages under the federal securities laws. Today, the stock price hovers around $9 per share.

137. ENTRA1, predictably, continued to receive scrutiny. On February 23, 2026, Politico published a new story, entitled "'Just a couple of guys': How a little-known company could score big from a Trump trade deal," stating that ENTRA1 "is ***largely unknown*** in the nuclear industry, ***never*** completed a nuclear project and, according to the address listed on its website, is ***headquartered out of a WeWork office in Houston***," further confirming the red flags discussed in the Guggenheim Securities and Iceberg Research reports. Indeed, "[w]hen asked" by Politico "if Entra1 had ever completed a nuclear project," ENTRA1 responded that the most it had done was "analyze[]" a few reactor technologies as "'due diligence.'"

138. ENTRA1 remains evasive. When journalists from Politico contacted ENTRA1 for its February 23, 2026 article, "ENTRA1 'declined to disclose how many people it employs, when it was founded and why it appears to operate out of a co-working space in Houston.'" Absurdly, ENTRA1 claimed that "[a]nswering those questions . . . would 'involve confidential information, material non-public information, ongoing financing discussions, or matters subject to legal obligations and/or non-disclosure agreements.'" Sharing Politico's experience, another analyst, Stephen Tobin, also previously "asked all parties concerned to shed light" on ENTRA1's track record and funding, but they "declined to do so."

139. This level of obfuscation is highly unusual in the nuclear industry. As the Citi analyst Bagri pointed out:

> "Nuclear projects are obviously large, multibillion-dollar, multiyear projects, extremely hard to execute . . . highly regulated projects,'" . . . . 'So generally, we see names of the leaders, evidence of proof, what they've executed on. Generally, we see what projects they've worked on, ***which is missing*** [for ENTRA1], and that's the genesis of the questions."

According to the Wall Street investors and nuclear experts that Politico spoke to as part of its reporting, ENTRA1's "lack of experience in this [nuclear] space, the dearth of information about its operations and threadbare staffing make it a risky choice."

**D. NuScale Sells Hundreds of Millions of Dollars of Company Common Stock to Fund Its Business and Pay ENTRA1**

140. Taking advantage of its inflated share price during the Class Period, NuScale disclosed in its November 6, 2025 press release that it had "[s]old ***13.2 million*** shares through an ATM program during the third quarter, generating ***$475.2 million in gross proceeds***," thereby increasing their liquidity to $753.8 million. According to analysts, this "jumbo" ATM issuance would primarily be used to fund the initial $500 million PMA payment to ENTRA1. On the 3Q25 earnings call that occurred later in the day on November 6, 2025, Hamady further disclosed that as of June 30, 2025, NuScale had only $489.9 million – meaning that, without the ATM, NuScale would not have had enough funds to make the first milestone payment to ENTRA1.

**E. Starting the Following Month, Fluor Sells $600 Million in NuScale Common Stock**

141. In September 2025, shortly after NuScale's ATM offering program began in August, Fluor also began selling ***15 million shares*** of NuScale's stock into the open market. Between September 16, 2025 and October 8, 2025, Fluor sold all 15 million shares for gross proceeds of ***$604,875,373***.

142. Fluor had previously been open regarding its intention to eventually reduce its stake in NuScale, but Fluor's long term plan was to retain a 20%-25% stake in NuScale. However, that

plan changed and on November 6, 2025, Fluor revealed that it would fully monetize its ***entire*** NuScale stake by the end of 2Q26.

143. After the Class Period, Fluor continued selling its shares of NuScale common stock until April 2026, when it completed the liquidation of its entire equity stake in the Company. After having invested hundreds of millions into NuScale and over a decade of time, Fluor divested itself from the Company before NuScale had commercialized a single NPM.

## VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. NuScale and the Individual Defendants' Misstatements and Omissions

144. The Class Period begins on March 3, 2025. After the market closed that day, NuScale reported its fourth quarter and full year 2024 results and filed its annual report on Form 10-K with the SEC. The March 3, 2025 Form 10-K made numerous representations regarding ENTRA1's capabilities, including its ability to build and operate nuclear plants "within acceptable cost, time and risk profiles" for prospective customers. The March 3, 2025, Form 10-K informed investors that:

> ENTRA1 will ***develop and construct new build energy plants*** that will be designated / identified as ENTRA1 Energy Plants™ with NuScale SMRs inside and are the ideal ***solutions*** addressing the challenges and meeting the objectives for the customer. The ***ENTRA1 Solution*** was developed to specifically address the key needs of nuclear energy deployment projects, lessons learned from past projects, and most importantly the real-world requirements, constraints and considerations of utilities, off-takers and stakeholders. The ENTRA1 Solution is a "***one-stop-shop***" integrated offering to deployment that proactively ***combines facility design and construction, development, financing, licensing, manufacturing and operations*** in a framework that delivers new dispatchable, carbon-free baseload generation capacity ***within acceptable cost, time and risk profiles for utilities, off-takers and stakeholders***.

145. Hopkins and Hamady signed the 10-K. NuScale's Board also signed the 10-K, including Boeckmann, Breuer, and Collins.

146. The Form 10-K further referred investors to www.nuscalepower.com. There, NuScale stated, throughout the Class Period, that ENTRA1 "stands as a ***global powerhouse in the energy sector***" and an "***independent energy production company***," and that "***ENTRA1's capabilities extend to providing bespoke plant development, ownership, and operating mechanisms***." The NuScale website further claimed that ENTRA1 "leverage[s] NuScale's certified SMR Technology ***to energize their diverse portfolio of power plants***, ensuring each energy consumer's distinct needs are met." NuScale's press releases issued during the Class Period also encouraged investors to visit the Company's website to "learn more."

ENTRA1

> ENTRA1 stands as a global powerhouse in the energy sector, steadfast in its mission to bolster energy security worldwide. As an independent energy production company, ENTRA1 is deeply committed to navigating the energy transition spectrum to deliver power solutions that are not only reliable and cost-efficient, but also mindful of their environmental impact.
>
> Boasting a robust pipeline of global energy projects, ENTRA1's capabilities extend to providing bespoke plant development, ownership, and operating mechanisms. They leverage NuScale's certified SMR Technology to energize their diverse portfolio of power plants, ensuring each energy consumer's distinct needs are met. In essence, ENTRA1 embodies the perfect blend of innovation and sustainability in the ever-evolving energy landscape.

147. Following these disclosures, NuScale's stock price increased over 11.5%, closing at $17.23 per share on March 4, 2025, up from $15.45 per share at the close of market on March 3, 2025.

148. The statements referenced in ¶¶144 and 146 above were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a) ENTRA1 did not have the experience or capabilities to "develop and construct new build [nuclear] energy plants," despite it being a central tenet of the ENTRA1 "solution" for the commercialization of the Company's NPMs. Nor did ENTRA1 have the experience or capabilities

to offer a "one-stop-shop" for customers or the ability to provide customers with "facility design and construction, development, financing, licensing, manufacturing and operations" capabilities that would allow it to provide nuclear power "within acceptable cost, time and risk profiles." In reality, ENTRA1 lacked any experience or established project-development capabilities. ENTRA1 had never built, financed, or operated any significant projects – let alone a demonstrated history of developing, financing, constructing, owning, or operating nuclear-energy projects. Its principals had no experience with nuclear power or the development of nuclear power plants, and ENTRA1 had just a handful of employees who operated from a WeWork address it shared with NuScale, not a dedicated and substantial staff of technical, engineering, and affiliated personnel sufficient to develop a nuclear power project. Indeed, NuScale employed hundreds of people, including engineers and technical experts, and they were unable to successfully execute such projects;

(b) Nor was ENTRA1 a "global powerhouse in the energy sector." It did not have "capabilities [that] extend[ed] to providing bespoke plant development, ownership, and operating mechanisms." As stated above, in reality, ENTRA1 lacked any experience or established project-development capabilities. ENTRA1 had never built, financed, or operated any significant projects – let alone a demonstrated history of developing, financing, constructing, owning, or operating nuclear-energy projects. Its principals had no experience with nuclear power or the development of nuclear power plants, and ENTRA1 had just a handful of employees that operated out of a WeWork space it shared with NuScale, not a dedicated and substantial staff of technical, engineering, and affiliated personnel sufficient to develop a nuclear power project. Indeed, NuScale employed hundreds of people, including engineers and technical experts, and they were unable to successfully execute such projects. For the same reasons it was misleading to refer to ENTRA1 as an "independent energy production company";

(c) ENTRA1's lack of relevant experience and resources to commercialize advanced nuclear technologies or develop, build, and operate nuclear power infrastructure projects increased the risk of execution failures, financing difficulties, licensing delays, cost overruns, construction delays, the ability to reach final deals with potential customers to build NuScale power plants or purchase power from such plants, and other setbacks;

(d) ENTRA1 did not have a "diverse portfolio of power plants." In truth, it had never built, financed, or operated any significant projects; and

(e) Defendants' statements conveyed the impression that ENTRA1 was a sophisticated entity with the experience, capacities, and resources to develop, build, and operate complex nuclear power projects. In reality, it was "just a couple of guys," with no relevant experience in the nuclear field.

149. After market close on May 12, 2025, NuScale reported its financial results for its first quarter ending March 31, 2025. That same day, NuScale held a conference call with analysts to discuss the Company's financial and operational results, which was hosted by defendants Hopkins and Hamady. During his prepared remarks, defendant Hopkins emphasized ENTRA1's "lead[ing]" role in customer discussions and claimed "[p]otential customers" were "attracted to ENTRA1's commercial model," stating in pertinent part as follows:

> In collaboration with our exclusive commercialization partner, ENTRA1 Energy, we are in various stages of discussions with potential customers, both here in the US and abroad. Domestically, this includes discussions with government officials and industries, including data centers, utilities, coal plant operators transitioning to nuclear, and petrochemical and energy companies. Internationally, with stakeholders around the globe in Europe, the Middle East, Africa and Asia.
>
> On the data center front, ENTRA1 continues to lead discussions with major US hyperscalers, with a strong focus on powering AI operations. ***Potential customers continue to be attracted to ENTRA1's commercial model, which is designed to provide financial flexibility while mitigating deployment risks***.

150. Also on May 12, 2025, NuScale filed with the SEC a quarterly report on Form 10-Q for the quarter ending March 31, 2025 ("1Q25 Form 10-Q"), signed by Hopkins and Hamady. NuScale filed as an exhibit to the 1Q25 Form 10-Q the Strategic Alliance Agreement dated May 7, 2025, between NuScale Power LLC (a subsidiary of NuScale) and ENTRA1, which was incorporated by reference into the 1Q25 Form 10-Q (the "Strategic Agreement").

151. The Strategic Agreement, signed by Hopkins, emphasized ENTRA1's purported "experience" developing, managing, and financing global infrastructure projects, stating in pertinent part as follows:

> Whereas, the Company desires the access to ENTRA1's wide global network of relationships and appreciates ***ENTRA1's experience in connection with the development, management, and finance*** (including arranging/evaluating finance options) for global infrastructure projects[.]

152. Following these disclosures, NuScale's stock price increased over 20%, rising from a closing price of $17.79 per share on May 12, 2025, to $21.64 per share on May 13, 2025.

153. The statements referenced in ¶¶149 and 151 above were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a) ENTRA1's model did not "mitigat[e] deployment risks," it increased them. ENTRA1 did not have "experience in connection with the development, management, and finance" for global infrastructure projects, as NuScale claimed. In reality, ENTRA1 lacked any experience or established project-development capabilities. ENTRA1 had never built, financed, or operated any significant projects – let alone a demonstrated history of developing, financing, constructing, owning, or operating nuclear-energy projects. Its principals had no experience with nuclear power or the development of nuclear power plants, and ENTRA1 had just a handful of employees operating from a WeWork address it shared with NuScale, not a dedicated and substantial staff of technical, engineering, and affiliated personnel sufficient to develop a nuclear power project. Indeed, NuScale

employed hundreds of people, including engineers and technical experts, and they were unable to successfully execute such projects;

(b) ENTRA1's lack of relevant experience and resources to commercialize advanced nuclear technologies or develop, build, and operate nuclear power infrastructure projects did not "mitigate" risks, as claimed, it increased them; specifically, the risk of plant development execution failures, financing difficulties, licensing delays, cost overruns, construction delays, the ability to reach final deals with potential customers to build NuScale power plants or purchase power from such plants, and other setbacks;

(c) Defendants' statements conveyed the impression that ENTRA1 was a sophisticated entity with the experience, capacities, and resources to develop, build, and operate complex nuclear power projects. In reality, it was "just a couple of guys," with no relevant experience in the nuclear field; and

(d) The statements omitted that NuScale had chosen an "exclusive commercialization partner," entrusted to commercialize and deploy NuScale's NPMs, that lacked any prior experience owning, financing, or operating nuclear energy facilities.

154. On May 29, 2025, NuScale issued a press release announcing that the Company had received design approval from the NRC for its uprated 250 MWT NuScale Power Module ("May 2025 Press Release"). The May 2025 Press Release represented that ENTRA1 was an "independent power plant development platform," stating in pertinent part as follows:

> The U.S. NRC's uprate approval of the NuScale SMR technology now strengthens ENTRA1 Energy to produce and deliver energy as the most near-term American SMR power solution via ENTRA1 Energy Plants(TM) with NuScale SMR technology inside. ENTRA1 Energy is NuScale's partner and ***independent power plant development platform***, which holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's SMRs.

155. The May 2025 Press Release further claimed ENTRA1 was a "one-stop-shop" and "single hub for the financing, investment, development, execution, and/or management of ENTRA1 Energy Plants(TM) with NuScale SMRs-inside."

156. The statements referenced in ¶¶154-155 above were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a) ENTRA1 did not have the experience or capabilities to offer a "one-stop-shop" for customers or operate as a "single hub" providing "financing, investment, development, execution, and/or management of ENTRA1 Energy Plants(TM) with NuScale SMRs-inside." In reality, ENTRA1 lacked any experience or established project-development capabilities. ENTRA1 had never built, financed, or operated any significant projects – let alone a demonstrated history of developing, financing, constructing, owning, or operating nuclear-energy projects. Its principals had no experience with nuclear power or the development of nuclear power plants, and ENTRA1 had just a handful of employees operating from a WeWork address it shared with NuScale, not a dedicated and substantial staff of technical, engineering, and affiliated personnel sufficient to develop a nuclear power project. Indeed, NuScale employed hundreds of people, including engineers and technical experts, and they were unable to successfully execute such projects. For the same reasons it was misleading to refer to ENTRA1 as an "independent power plant development platform";

(b) ENTRA1's lack of relevant experience and resources to commercialize advanced nuclear technologies or develop, build, and operate nuclear power infrastructure projects increased the risk of execution failures, financing difficulties, licensing delays, cost overruns, construction delays, the ability to reach final deals with potential customers to build NuScale power plants or purchase power from such plants, and other setbacks;

(c) The statements conveyed the impression that ENTRA1 was a sophisticated entity with the experience, capacities, and resources to develop, build, and operate complex nuclear power projects. In reality, it was "just a couple of guys," with no relevant experience in the nuclear field; and

(d) The statements, including that ENTRA1 "holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's SMRs," omitted that NuScale had entrusted its commercialization, distribution, and deployment of its NPMs to an entity that lacked any prior experience owning, financing, or operating nuclear energy facilities.

157. On August 7, 2025, NuScale issued a press release after market close reporting the Company's financial results for its second quarter ending June 30, 2025. Later that same day, NuScale held an earnings call with analysts to discuss the Company's 2Q25 financial and operational results, which was hosted by defendants Hopkins and Hamady. During his prepared remarks, defendant Hopkins highlighted NuScale's "global commercial partnership" with ENTRA1 and represented that ENTRA1 provided "customized plant development, ownership, and operating structures," stating in pertinent part as follows:

> Under this partnership, NuScale serving as a technology provider sells its NuScale power modules directly to ENTRA1 for installation and reactor buildings of ENTRA1 energy plants. ***ENTRA1, in turn, develops, finances and, depending on the business model, may own and operate the energy production plants powered by NuScale's SMR technology***.
>
> ***By providing customized plant development, ownership, and operating structures, ENTRA1 is able to de-risk projects*** and meet each customer's unique needs.

158. Defendant Hamady referred analysts and investors to a presentation used in connection with the earnings call, which he stated contained a "good explanation of the business

plan with ENTRA1." The presentation contained the following slide regarding NuScale's "exclusive global strategic partner commercializing [its] SMR technology," ENTRA1:




159. As seen above, the presentation stated that "ENTRA1 develops, finances, and depending on the business model, owns and operates energy production plants powered by NuScale's SMR technology. ENTRA1's approach of providing customized plant development, ownership, and operating structures de-risk the project and meets each customer's unique needs."

160. During the earnings call, Hamady also represented that ENTRA1 "***is a developer of [power plants]***" that use NPMs and that the entity's work as NuScale's developer was a "***differentiator***" for the Company, stating in pertinent part as follows:

> [B]ut it's important to remember, when we say – when we talk about our customers, ENTRA1 is our customer. ***ENTRA1 is a developer of [power plants]***. They're ENTRA1 power plants with NuScale in[side], like [computers] like an Intel chip, where the Intel chip inside in this case, in the power plant.

* * *

> Whether it be a utility or government or military, whomever it is, ENTRA1's been out there selling the PPAs and selling the power. So it's – just so we kind of cross this correctly. I want the market to understand what the story is and what the business model is because that business model, ***the fact that we have ENTRA1 as our developer is a differentiator***, right?

161. Defendant Hamady continued in pertinent part as follows:

> So again, we talk about customers, let's be clear, I do this for some of our newer analysts, I think it's important. We have one customer, that customer is ENTRA1. ENTRA1 faces the market. ***They develop the power plants***, they sell the power. We just sell the NuScale power module where the intel side of the lap[top], if you use that analogy [or whatever analogy] you want to use. We're the tech inside the power plant. We're not the power plant developer.

162. The statements referenced in ¶¶157-161 above were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a) ENTRA1 did not have the experience or capabilities to "develop," "finance" or "own and operate" nuclear power plants. Nor did it have the capabilities to offer "customized plant development, ownership, and operating structures" able to "de-risk" nuclear projects. In reality, ENTRA1's involvement increased risks, as it lacked any experience or established project-development capabilities. ENTRA1 had never built, financed, or operated any significant projects – let alone a demonstrated history of developing, financing, constructing, owning, or operating nuclear-energy projects. Its principals had no experience with nuclear power or the development of nuclear power plants, and ENTRA1 had just a handful of employees operating from a WeWork address it shared with NuScale, not a dedicated and substantial staff of technical, engineering, and affiliated personnel sufficient to develop a nuclear power project. Indeed, NuScale employed hundreds of people, including engineers and technical experts, and they were unable to successfully execute such projects;

(b) Rather than "de-risk" projects, ENTRA1's lack of relevant experience and resources to commercialize advanced nuclear technologies or develop, build, and operate nuclear

power infrastructure projects increased the risk of execution failures, financing difficulties, licensing delays, cost overruns, construction delays, the ability to reach final deals with potential customers to build NuScale power plants or purchase power from such plants, and other setbacks;

(c) The statements, including that ENTRA1 would serve as NuScale's "exclusive global strategic partner commercializing [its] SMR technology," omitted that NuScale had entrusted its commercialization, distribution, and deployment of its NPMs to an entity that lacked any prior experience owning, financing, or operating nuclear energy facilities; and

(d) Defendants' statements conveyed that ENTRA1 was a sophisticated entity with the experience, capacities, and resources to develop, build, and operate complex nuclear power projects. In reality, it was "just a couple of guys" with no relevant experience in the nuclear field. ENTRA1 was therefore not a helpful "differentiator" for NuScale, but rather a liability.

163. On September 3, 2025, NuScale issued a release announcing its support for ENTRA1's agreement with the TVA to deploy up to six gigawatts of NuScale SMR capacity ("September 2025 Release"). The September 2025 Release quoted defendant Hopkins who emphasized the purported "'experience'" of ENTRA1 as "'exactly what is required'" to commercialize and deploy NPMs, stating in pertinent part as follows:

> "ENTRA1's team of energy and finance veterans brings exceptional value to our ***partnership-combining energy sales knowledge, investment and asset management capabilities, deep project finance expertise, and experience in delivering large-scale power infrastructure***. ***Their experience is exactly what is required as we enter this critical next phase of commercializing and deploying NuScale Power Modules(TM) into ENTRA1 Energy Plants(TM)***. Together, we are ready as partners to meet America's surging demand for reliable, carbon-free baseload power-powering AI data centers, critical mining, semiconductor manufacturing, and the energy-intensive industries that are driving our nation's economic future."

164. In addition, the September 2025 Release represented that ENTRA1 was an "independent global energy production platform" and a "one-stop-shop and single hub for the

deployment, financing, investment, development, execution, and/or management of" nuclear power plants, stating in pertinent part as follows:

> ENTRA1 Energy is an American ***independent global energy production platform*** dedicated to increasing energy security by providing safe, reliable, baseload energy. ENTRA1 Energy is led by an executive team of energy, infrastructure, and finance sector veterans ***drawing on significant experience in the investment, development, and execution of critical infrastructure projects globally***. ENTRA1 Energy is focused on producing and selling power by commercializing and deploying American nuclear and natural gas technologies ***in its power infrastructure assets***.
>
> ENTRA1 Energy is NuScale's exclusive global strategic partner, and the two companies have an existing 50/50 joint venture company – ENTRA1 NuScale LLC. ENTRA1 Energy holds the global exclusive rights to the commercialization, distribution, and deployment of NuScale's products and services. ***ENTRA1 Energy is the one-stop-shop and single hub for the deployment, financing, investment, development, execution, and/or management of ENTRA1 Energy Plants(TM) with NuScale SMRs inside***.

165. The statements referenced in ¶¶163-164 above were materially false and misleading when made. As Defendants knew or recklessly disregarded:

(a) ENTRA1 did not have the "experience" that was "required" for "commercializing and deploying NuScale Power Modules into ENTRA1 Energy Plants" and NuScale was not an "independent global energy production platform." In reality, ENTRA1 lacked any experience or established project-development capabilities. ENTRA1 had never built, financed, or operated any significant projects – let alone a demonstrated history of developing, financing, constructing, owning, or operating nuclear-energy projects. Its principals had no experience with nuclear power or the development of nuclear power plants, and ENTRA1 had just a handful of employees operating from a WeWork address it shared with NuScale, not a dedicated and substantial staff of technical, engineering, and affiliated personnel sufficient to develop a nuclear power project. Indeed, NuScale employed hundreds of people, including engineers and technical experts, and they were unable to successfully execute such projects;

(b) For the same reasons as stated above, ENTRA1 did not have the experience or capabilities to offer a "one-stop-shop" for customers or operate as a "single hub" providing "financing, investment, development, execution, and/or management of ENTRA1 Energy Plants(TM) with NuScale SMRs-inside";

(c) The statements, including the statement that ENTRA1's executive team possessed "significant experience in the investment, development, and execution of critical infrastructure projects globally," omitted that NuScale had entrusted its commercialization, distribution, and deployment of its NPMs to an entity that lacked any prior experience owning, financing, or operating nuclear energy facilities and that ENTRA1 itself lacked any experience or established project-development capabilities, including because ENTRA1 had never built, financed, or operated any significant projects. Further, the purported experience and qualifications attributed to ENTRA1 did not belong to ENTRA1 itself, but instead referred to the experience and qualifications of the principals of the Habboush Group, a separate entity, and neither ENTRA1 nor the Habboush Group possessed any experience in the field of nuclear power generation;

(d) The statement that ENTRA1 possessed "power infrastructure assets" was false and misleading because ENTRA1 had never built, financed, or operated any significant projects;

(e) ENTRA1's lack of relevant experience and resources to commercialize advanced nuclear technologies or develop, build, and operate nuclear power infrastructure projects increased the risk of execution failures, financing difficulties, licensing delays, cost overruns, construction delays, the ability to reach final deals with potential customers to build NuScale power plants or purchase power from such plants, and other setbacks; and

(f) The statements conveyed the impression that ENTRA1 was a sophisticated entity with the experience, capacities, and resources to develop, build, and operate complex nuclear

power projects. In reality, it was "just a couple of guys" with no relevant experience in the nuclear field.

**B. Items 303 and 105**

166. Regulation S-K Item 303(a)(3)(ii), 303(b) (and Instruction No. 3 to Paragraph 303(a)) ("Item 303") requires companies to:

> [D]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material impact (favorable or unfavorable) on net sales or revenues or income from continuing operations.
>
> * * *
>
> The discussion and analysis [shall] focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results . . . .

167. The SEC expressly mandates disclosure of a known trend or uncertainty that is ***reasonably likely*** to have a material effect on the "registrant's financial condition or results of operations."

168. The failure of NuScale's periodic SEC filings to disclose the true qualifications and experience (or lack thereof) of the Company's exclusive commercialization partner violated Item 303, because these undisclosed facts were known to Defendants and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This failure also violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant factors that made an investment in NuScale common stock speculative or risky.

## VII. ADDITIONAL SCIENTER AND SCHEME ALLEGATIONS

### A. Defendants Knew or Were Reckless in Not Knowing that ENTRA1 Was Unqualified

169. As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated during the Class Period to the investing public in the name of the Company, or in their own name, were materially false and misleading. NuScale and the Individual Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding NuScale, and their control over and/or receipt and/or modification of NuScale's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

170. Defendants knew and/or recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public. Accordingly, the fraud described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

171. The Individual Defendants, because of their positions with NuScale, controlled the contents of NuScale's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations

that were being made were false and misleading. As a result, each of the Individual Defendants, NuScale, and Fluor is responsible for the accuracy of NuScale's corporate statements and is, therefore, responsible and liable for the representations contained therein.

### 1. NuScale and the Individual Defendants Held Themselves out as Knowledgeable Regarding ENTRA1's Experience and Capabilities

172. NuScale and the Individual Defendants repeatedly held themselves out as knowledgeable regarding ENTRA1's experience and capabilities. For example, in speaking with analysts and investors during NuScale's November 6, 2025 earnings call, defendant Hopkins represented that he and others at NuScale performed substantial "due diligence" on ENTRA1's purported prior experience, which he stated included "looking at their extensive knowledge of building coal-fired plants, combined cycle plants." During NuScale's November 8, 2023 earnings call, Hamady made similar representations in response to analyst questions, telling them that NuScale was familiar with ENTRA1's background and credentials because "***as a management team***, we spend a lot of time vetting potential clients. ***We spend a lot of time vetting into one as a development partner***. ***This is what we do for our living***."

173. And, previously, during the October 6, 2023 NuScale Analyst Day presentation, Hopkins told investors that NuScale and ENTRA1 had "got[ten] together over a year ago" and "strategically went into the white room" – a secure space where parties share due diligence related information – and that "Ramsey [Hamady] knows ***intimately*** about the process." NuScale's statements confirming that the Company undertook extensive due diligence into ENTRA1 and its background and capabilities demonstrates the Individual Defendants' knowledge.

174. That Hopkins and Hamady repeatedly addressed analysts' questions directly on this topic further reflects that they either knew, or were reckless in not knowing, ENTRA1's capabilities

(or lack thereof). During the November 6, 2025 earnings call, for example, when questioned on ENTRA1 by analysts, Hopkins stated: "They're an independent global energy company, and they have – to your point, over 45 years as [Habboush] [G]roup, years of experience, delivering large-scale energy and infrastructure projects worldwide." And NuScale's Chief Commercial Officer, Clayton Scott, explicitly claimed that "they've built a lot of plants" and that "they have a lot of experience, in my opinion." Such statements could not have been made without knowledge of ENTRA1's experience and capabilities. To the extent the statements were made without knowledge, they demonstrate recklessness.

175. Other statements made by NuScale throughout the Class Period similarly demonstrate that the Individual Defendants either knew, or were reckless in not knowing, ENTRA1's capabilities, having spoken specifically on that issue in detail. For example, NuScale's March 3, 2025 Form 10-K specifically stated that the ENTRA1 "solution" "combines facility design and construction, development, financing, licensing, manufacturing and operations in a framework . . . within acceptable cost, time and risk profiles" for customers. NuScale's website likewise represented that ENTRA1's "capabilities extend to providing bespoke plant development, ownership, and operating mechanisms," and even told investors that ENTRA1 had a "diverse portfolio of power plants."

176. NuScale's contracts with ENTRA1 also referenced ENTRA1's "experience," and are therefore indicative of the Individual Defendants' knowledge of the same. The May 7, 2025 Strategic Alliance Agreement between NuScale Power LLC (a NuScale subsidiary), for example, included a term highlighting ENTRA1's "experience in connection with the development, management, and finance." And the PMA agreement also noted ENTRA1's purported "expertise" and "distinctive capabilities." Hopkins even stated in NuScale's September 3, 2025 press release

that ENTRA1's "'experience is exactly what is required as we enter this critical next phase of commercializing and deploying NuScale Power Modules(TM) into ENTRA1 Energy Plants(TM).'"

### 2. The Defendants Had Longstanding Relationships with ENTRA1's CEO and CPO, and NuScale Even Shared an Address with ENTRA1

177. Hamady previously worked for Habboush at the Habboush Group in a high level position for years, from approximately 2016 to 2022. He therefore knew Habboush well, his lack of experience in the nuclear field, and ENTRA1's capabilities (or lack thereof) to build major infrastructure projects.

178. Similarly, Hopkins had a longstanding relationship with Habboush. As Hopkins said during NuScale's October 6, 2023 Analyst Day presentation, "I have known the [Entra1] CEO [Wadie Habboush] for ***many, many years***." As Hopkins explained, his relationship with Habboush went back to his time at Fluor, when Habboush and Hopkins "used to have a joint pitch and partnership in a company I used to belong to [Fluor]." Prior to NuScale, Hopkins spent over two decades at Fluor, where he served as a corporate officer from 1999 until 2012, and held various leadership roles in global operations and business development, before being installed by Fluor as NuScale's CEO in 2012.

179. Even NuScale's Chief Commercial Officer, Clayton Scott, said during the October 6, 2023 presentation that he had "traveled with [the] CEO of ENTRA1 globally." ENTRA1 and NuScale were so intertwined that they shared a WeWork office address in Houston. In a statement to Politico, ENTRA1 told reporters that it "works closely with NuScale 'in an ***integrated fashion*** and in ***close coordination*** while maintaining a common professional full-service office in Houston.'" NuScale therefore knew about ENTRA1's lack of experience in the nuclear field, its lack of

resources to take on and execute nuclear power projects, and the fact that ENTRA1 had no track record of building infrastructure projects.

180. Due to the connections between Fluor, NuScale, and both Habboush and the Habboush Group, including the joint venture between the Habboush Group and Fluor, Fluor also independently knew that ENTRA1 had no experience building infrastructure projects and that Habboush lacked nuclear experience. In fact, Skip Alvarado, ENTRA1's CPO, previously worked for Fluor as a vice president servicing ***oil and gas*** clients. Fluor also knew this information through its representatives on NuScale's Board, which was comprised of current and former Fluor executives and directors.

### 3. Defendants Understood Investors Wanted More Information Regarding ENTRA1's Credentials, but They Continued to Conceal that Information

181. Defendants had known for years that investors wanted more information regarding ENTRA1, yet they continued to conceal it from the market. On the November 6, 2025 earnings call, Hamady acknowledged that "a lot of people would ask early on who's ENTRA1." In fact, during NuScale's November 8, 2023 earnings call two years earlier, the analyst from TD Cowen told the Company's management:

> [B]ut a lot of investors have mentioned that these two entities [ENTRA1 and a potential customer] are ***very unknown***. And when you go to their websites, there's ***not a whole lot there***. If you try to Google them, it doesn't appear that there's a lot of reference out there that at least we can find as outsiders.
>
> ***So investors are wondering how capable they are of really getting these projects across the finish line***.

182. Aside from offering vague assurances, however, NuScale's management deliberately obscured ENTRA1's capabilities (or lack thereof). Hamady told the analyst and the market to simply take their word for ENTRA1 and not to worry about it, stating: "as a management team, we

spend a lot of time vetting potential clients. We spend a lot of time vetting into one as a development partner. This is what we do for our living." Despite these questions from analysts and investors, however, Defendants continued to actively conceal ENTRA1's lack of experience throughout the Class Period.

183. For example, on the November 6, 2025 earnings call, Hopkins attempted to conflate the Habboush Group and ENTRA1, without informing analysts, to continue to overstate ENTRA1's prior experience, stating: "They're an independent global energy company, and they have – to your point, over 45 years as [Habboush] [G]roup, years of experience, delivering large-scale energy and infrastructure projects worldwide." It was only through pointed questions by persistent analysts that brought the truth to light.

184. To the extent that any Defendant was unaware of ENTRA1's real credentials, Defendants' failure to investigate ENTRA1's *bona fides* following those analyst comments and concerns was itself reckless, given that analysts raised them two years prior, in November 2023, before the start of the Class Period.

### 4. The Alleged Misrepresentations and Omissions Concerned NuScale's Core Operations

185. The misrepresentations and omissions alleged herein involved the core of NuScale's business: its ability to commercialize its NPM technology through its partnership with ENTRA1. As the Company's "exclusive" global commercialization partner for NuScale technology, ENTRA1 was of particular importance to the Company. NuScale publicly represented that ENTRA1 would be the one to originate, finance, build, own, and operate projects utilizing NuScale's power modules, serving as the exclusive commercialization platform through which NuScale would pursue opportunities.

186. For that reason, throughout the Class Period, analysts described ENTRA1 as "***pivotal***" to NuScale's future and that NuScale had "effectively put '***all its eggs in one basket***' with ENTRA1." Thus, "[a]s exclusive developer for the NPM, NuScale's ***future success is tied to ENTRA1's reputation and ability to execute on project development***." Defendants therefore would have known information regarding ENTRA1's reputation, capabilities, and experience, or were reckless in not knowing.

**B. Motive and Opportunity**

187. Defendants also had the motive and opportunity to defraud investors. NuScale repeatedly stated that it would need to continue to raise capital to fund its operations, telling investors in its March 3, 2025 Form 10-K that "[w]e expect we will require additional future funding," and that "[t]o date, we have not generated any material revenue, while we have substantial overhead expenses" and "[w]e do not expect to generate meaningful revenue unless and until we are able to finalize development of and commercialize our SMR technology and related services, and we may not be able to do so on our anticipated timetable, if at all." Obtaining financing to support the Company's commercialization efforts was therefore critical.

188. With no material source of revenue and substantial overhead, NuScale's ability to continue as a going concern relied on the amount of capital it could raise through outside sources, such as public offerings. As a consequence, and following their Class Period false and misleading statements, NuScale launched a public stock offering to fund the Company's continued operations.

189. While the price of NuScale Class A common stock was artificially inflated, NuScale cashed in, selling ***$475 million*** worth of NuScale Class A common stock through a registered ATM offering that began in August 2025, when NuScale's stock price was trading at ***more than double*** the price as at the start of the Class Period. This funding was critical to NuScale's commercialization

efforts, as NuScale did not otherwise have enough cash to fund the initial, nearly $500 million PMA payment to ENTRA1.

190. Fluor likewise took advantage of NuScale's inflated stock price, selling ***over $600 million*** in NuScale common stock in September and October 2025, shortly after the Company's ATM offering began in August. Fluor's insider sales were suspicious in both timing and amount, as Fluor had not previously sold any NuScale common stock into the market for at least the prior five years, and the sales occurred just after NuScale's own sales. As described in ¶¶49-50, Hamady's sales of NuScale common stock during the Class Period, were also suspicious in size and timing.

191. But for the alleged false and misleading statements, NuScale's Class Period stock price would have been substantially lower, and NuScale, Fluor, and Hamady would have been unable to capture ***over a billion dollars*** in gross proceeds from their sales. In all, NuScale, Fluor, and Hamady sold over 28 million shares of NuScale Class A common stock during the Class Period while in possession of material, non-public information regarding ENTRA1.

**C. Corporate Scienter**

192. The allegations above also establish a strong inference that NuScale and Fluor as entities acted with corporate scienter throughout the Class Period, as the Individual Defendants, NuScale's officers, management, and agents, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis, for the purpose and effect of concealing the fraudulent scheme from the investing public. By concealing these material facts from

investors, Defendants maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

**D. The One-Sided Nature of the PMA Is Indicative of Scienter and Constitutes a Separate, but Related Scheme**

193. The heavily one-sided nature of the PMA was structured to siphon funds out of NuScale and into the pocket of ENTRA1, an entity founded and run by a longstanding associate of Hopkins, Hamady, and Fluor – Habboush. The PMA required a $500 million payment from NuScale to ENTRA1 based on the signing of a non-binding agreement. The payment itself was final and irrevocable, meaning NuScale cannot claw it back if no deal is finalized. And even if a final deal is signed, the PMA does not require the power plants to be built within budget or on time, or that the Company's NPMs be used at all. Therefore, even if a deal is signed, there is no certainty that NuScale will ever actually be paid based on its partnership with ENTRA1.

194. Thus, NuScale, the Individual Defendants, and Fluor schemed to deliver a massive ~$500 million payment to ENTRA1, led by their close associate, Habboush, using NuScale funds, for nothing in return for NuScale or its investors, other than the further dilution brought on by the Company's August 2025 ATM offering necessitated by the terms of the PMA.

195. There was significant upside for each Defendant to take part in this scheme. First, ENTRA1 and Habboush would receive $500 million scot-free.

196. Second, by entering into the exclusive partnership agreement and PMA with ENTRA1, NuScale would be delivered a tantalizing (but far from certain) potential deal with the TVA, through ENTRA1, that could be used, when publicly announced, to not only further entice investors, but also other potential NuScale customers. As the analysts from RBC explained in a September 15, 2025 report, such non-binding agreements "can be an effective marketing tool in the

near-term to instill confidence in other potential customers, though conversion to a firm order is ultimately needed."

197. Third, the purportedly good news of such a historically large potential deal with the TVA would also likely be a boon to NuScale's stock price when announced, allowing Fluor to sell its shares at a higher price than it otherwise would have. Indeed, NuScale's stock price initially rose 16.6% following the September 2, 2025 announcement of the TVA agreement, which is the same month Fluor began selling 15 million shares, starting September 16, 2025. The plan to sell those shares, however, took place earlier with Fluor and NuScale announcing on August 1, 2025, an agreement that would allow Fluor to sell the 15 million shares into the market.

198. Last, NuScale also could have benefited from the TVA announcement, and the attendant increase in the Company's stock price, because NuScale's ATM offering, announced August 11, 2025, allowed the Company to sell shares directly into the secondary market at prevailing (inflated) market prices over time, and NuScale retained, under the terms of the offering, the flexibility of when and how much to sell. Defendants had ample time to plan and execute the scheme because, as Hopkins noted during the November 6, 2025 earnings call, the TVA agreement "just didn't happen overnight. It was a long term almost a year between TVA and ENTRA1 coming to terms of the term sheet."

199. Each Defendant is liable as a participant in this fraudulent scheme.

**E. NuScale's Revolving Door of Legal Counsel During the Class Period**

200. During and after the Class Period, an unusual number of Chief Legal Officers ("CLO") cycled through NuScale. First, on June 30, 2025, NuScale announced Shahram Ghasemian ("Ghasemian") had joined NuScale as CLO. However, just three and a half months later, NuScale announced in an October 20, 2025 press release that James D. Canafax ("Canafax") had been named

CLO, without any reference to or provided explanation of Ghasemian's departure. Within three months, Canafax was also replaced as CLO by William J. Cooper ("Cooper") in January 2026. Again, no mention was made of Canafax's departure, and this time, NuScale did not even issue a press release announcing Cooper's hiring. These frequent and unexplained departures of NuScale's CLOs in rapid succession during and directly following the Class Period are suspicious and further support a strong inference of scienter.

## VIII. LOSS CAUSATION AND ECONOMIC LOSS

201. The market for NuScale Class A common stock was open, well-developed, and efficient during the Class Period. Throughout the Class Period, NuScale Class A common stock traded at artificially inflated prices as a direct result of the alleged materially misleading statements and omissions regarding ENTRA1's qualifications, capabilities, and ability to commercialize NuScale's SMR technology, which were widely disseminated to the securities market, investment analysts, and the investing public. Lead Plaintiffs and other Class members purchased or otherwise acquired NuScale common stock relying upon the integrity of the market price of NuScale's Class A common stock and market information relating to NuScale.

202. As the relevant truth and its impact on NuScale's prospects entered the market, the price of NuScale common stock significantly dropped as the artificial inflation came out of the stock price. As a result of their purchases of NuScale common stock during the Class Period, Lead Plaintiffs and other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.

203. As a direct result of the disclosures and leakage that began after market close on August 7, 2025, and are detailed in ¶¶10, 99-100, NuScale's stock price suffered a significant decline. As set forth in the chart below, the price of NuScale common stock traded on the NYSE

dropped nearly 12%, from $44.68 per share on August 7, 2025, to $39.35 per share on August 8, 2025, on heavy trading volume of nearly 22 million NuScale common stock. Comparatively, on August 8, 2025, the NYSE was ***up*** 0.3%.




204. The disclosures and leakage that occurred on September 2, 2025 and September 3, 2025, detailed in ¶¶11-14, 101-112, also had a direct impact on NuScale's stock price, as the market digested the news. As set forth in the chart below, the price of NuScale common stock traded on the NYSE dropped nearly 11% from $40.42 per share on September 3, 2025, to $36.03 per share on September 4, 2025, on heavy trading volume of 19.5 million shares. Comparatively, on September 4, 2025, the NYSE was ***up*** 0.7%.



205. The disclosures and leakage that began after market close on November 6, 2025, detailed in ¶¶15-20, 115-129, also had a direct impact on NuScale's stock price. As set forth in the chart below, the price of NuScale common stock traded on the NYSE dropped 12.4% over a 2-day trading period, from $32.46 per share on November 6, 2025, to $28.43 per share on November 10, 2025. Comparatively, during the same period, the NYSE was ***up*** 1.3%. Each trading day evinced abnormally high trading volume, with more than 42 million NuScale common stock traded on November 7, 2025, and more than 31 million NuScale common stock traded on November 10, 2025 (the next trading day after a weekend).




206. Each of these stock drops on August 8 and September 4 of 2025, and together on November 7 and 10 of 2025, were significant, meaning that they cannot be explained by broader market or sector news, and are instead attributable to NuScale-specific information.

207. The price of NuScale Class A common stock continued to fall in subsequent days, dropping to a low of just $17 per share by November 21, 2025 – more than 70% below the Class Period high of more than $57 per share – and causing Plaintiffs and the Class (defined below) to suffer significant financial losses and economic damages under the federal securities laws. Currently NuScale's Class A common stock is trading at around $9 per share.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE ON THE FRAUD-ON-THE MARKET DOCTRINE

208. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- NuScale's Class A common stock traded in an efficient market was liquid and traded with moderate to heavy volume during the Class Period;
- the Company's Class A common stock was traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and
- Lead Plaintiffs and members of the Class purchased, acquired, and/or sold NuScale common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

209. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

210. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizen v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. CLASS ACTION ALLEGATIONS

211. Plaintiffs bring this action on behalf of all purchasers or acquirers of NuScale common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families,

their legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest.

212. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NuScale Class A common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NuScale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class action. Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country. Joinder would be highly impracticable.

213. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

214. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

215. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities were violated by Defendants' acts as alleged herein;

(b) whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c) whether the prices of NuScale common stock during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(d) whether the members of the Class have sustained damages and, if so, the proper measure of damages.

216. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. COUNTS FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

### COUNT I
**For Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Promulgated Thereunder Against NuScale, Fluor, the ENTRA1 Defendants, and the Individual Defendants**

217. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

218. During the Class Period, NuScale and the Individual Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219. NuScale and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchase of NuScale common stock during the Class Period.

220. Fluor and the ENTRA1 Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud; or

(b) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchase of NuScale common stock during the Class Period.

221. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for NuScale common stock. Plaintiffs and the Class would not have purchased or acquired NuScale common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

222. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of NuScale common stock during the Class Period.

**COUNT II**
**For Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants and Fluor**

223. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

224. During the Class Period, the Individual Defendants and Fluor acted as controlling persons of NuScale within the meaning of §20(a) of the 1934 Act. By virtue of their stock holdings, positions, and their power to control public statements about NuScale, the Individual Defendants and Fluor had the power and ability to control the actions of NuScale and its employees. By reason of such conduct, the Individual Defendants and Fluor are liable pursuant to §20(a) of the 1934 Act.

**COUNT III**
**For Violation of Section 20A of the 1934 Act**
**Against Fluor**

225. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count III is brought pursuant to §20A of the 1934 Act on behalf of Plaintiffs who were damaged by Fluor's insider trading.

226. As detailed herein, Fluor was in possession of material, non-public information concerning NuScale and ENTRA1 through its representatives on NuScale's Board and its prior dealings with ENTRA1's CEO. Fluor took advantage of its possession of that material, non-public information to obtain hundreds of millions of dollars of gross proceeds from insider trading during the Class Period.

227. Defendant Fluor's sales of NuScale Class A common stock were made contemporaneously with Plaintiffs' purchases of NuScale's Class A common stock during the Class Period.

228. During the Class Period, Fluor sold over 15 million shares of NuScale Class A common stock over the course of 2 months for gross proceeds of over $600 million. Those transactions are set out in the chart below.

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 16-Sep-25 | $37.97 | 6,559 | $249,045 |
| 16-Sep-25 | $37.25 | 764,984 | $28,495,654 |
| 17-Sep-25 | $36.36 | 166,949 | $6,070,266 |
| 17-Sep-25 | $35.86 | 410,097 | $14,706,078 |
| 18-Sep-25 | $40.59 | 113,291 | $4,598,482 |
| 18-Sep-25 | $39.97 | 350,765 | $14,020,077 |
| 18-Sep-25 | $39.08 | 286,634 | $11,201,657 |
| 18-Sep-25 | $37.90 | 322,258 | $12,213,578 |
| 18-Sep-25 | $36.96 | 120,556 | $4,455,750 |
| 19-Sep-25 | $46.75 | 296,329 | $13,853,381 |
| 19-Sep-25 | $45.61 | 500,333 | $22,820,188 |
| 19-Sep-25 | $44.79 | 456,820 | $20,460,968 |
| 19-Sep-25 | $43.67 | 437,417 | $19,102,000 |
| 19-Sep-25 | $42.92 | 150,335 | $6,452,378 |
| 19-Sep-25 | $41.76 | 241,868 | $10,100,408 |
| 19-Sep-25 | $40.55 | 61,543 | $2,495,569 |
| 19-Sep-25 | $39.88 | 227,918 | $9,089,370 |
| 22-Sep-25 | $46.68 | 165,868 | $7,742,718 |
| 22-Sep-25 | $47.26 | 100 | $4,726 |
| 22-Sep-25 | $45.71 | 228,434 | $10,441,718 |
| 22-Sep-25 | $44.80 | 372,380 | $16,682,624 |
| 22-Sep-25 | $44.01 | 346,000 | $15,227,460 |
| 22-Sep-25 | $42.84 | 100,287 | $4,296,295 |
| 23-Sep-25 | $43.68 | 269,367 | $11,765,951 |
| 23-Sep-25 | $42.88 | 307,188 | $13,172,221 |
| 23-Sep-25 | $41.89 | 405,133 | $16,971,021 |
| 24-Sep-25 | $42.31 | 266 | $11,254 |
| 24-Sep-25 | $41.74 | 97,048 | $4,050,784 |
| 24-Sep-25 | $40.64 | 430,563 | $17,498,080 |
| 24-Sep-25 | $39.74 | 246,044 | $9,777,789 |
| 25-Sep-25 | $36.82 | 224,264 | $8,257,400 |
| 25-Sep-25 | $38.57 | 148,010 | $5,708,746 |
| 25-Sep-25 | $39.22 | 1,358 | $53,261 |
| 25-Sep-25 | $37.77 | 591,417 | $22,337,820 |
| 26-Sep-25 | $38.25 | 287,958 | $11,014,394 |
| 26-Sep-25 | $37.71 | 300,762 | $11,341,735 |
| 29-Sep-25 | $40.05 | 62,196 | $2,490,950 |
| 29-Sep-25 | $39.36 | 310,463 | $12,219,824 |
| 29-Sep-25 | $38.34 | 324,551 | $12,443,285 |
| 30-Sep-25 | $37.17 | 320,387 | $11,908,785 |
| 30-Sep-25 | $36.47 | 588,668 | $21,468,722 |
| 1-Oct-25 | $36.70 | 418,939 | $15,375,061 |
| 1-Oct-25 | $35.86 | 113,415 | $4,067,062 |

| Transaction Date | Price | Shares Sold | Proceeds |
|---|---|---|---|
| 2-Oct-25 | $39.33 | 225,505 | $8,869,112 |
| 2-Oct-25 | $38.54 | 381,623 | $14,707,750 |
| 2-Oct-25 | $37.45 | 256,784 | $9,616,561 |
| 3-Oct-25 | $40.90 | 83,077 | $3,397,849 |
| 3-Oct-25 | $40.19 | 459,058 | $18,449,541 |
| 3-Oct-25 | $39.28 | 255,437 | $10,033,565 |
| 6-Oct-25 | $42.02 | 398,382 | $16,740,012 |
| 6-Oct-25 | $42.67 | 418,131 | $17,841,650 |
| 6-Oct-25 | $43.62 | 37,520 | $1,636,622 |
| 7-Oct-25 | $43.13 | 1,497 | $64,566 |
| 7-Oct-25 | $42.65 | 144,091 | $6,145,481 |
| 7-Oct-25 | $41.35 | 122,184 | $5,052,308 |
| 7-Oct-25 | $40.61 | 249,283 | $10,123,383 |
| 7-Oct-25 | $39.51 | 303,806 | $12,003,375 |
| 8-Oct-25 | $40.03 | 23,025 | $921,691 |
| 8-Oct-25 | $39.42 | 64,875 | $2,557,373 |
| | | **15,000,000** | **$604,875,373** |

229. In particular, on October 8, 2025, Fluor sold 87,900 shares of NuScale Class A common stock. Lead Plaintiffs together purchased over twenty thousand shares of NuScale Class A common stock on October 14, 2025, just four trading days later. *See* ECF 20 at 14.

230. Plaintiffs who purchased shares of NuScale Class A common stock contemporaneously with sales by Fluor suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of §§10(b) and 20(a) of the 1934 Act as alleged herein; and (2) they would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and concealment alleged herein.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Lead Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

D. Awarding Lead Plaintiffs and other members of the Class such other injunctive or equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

## XIII. JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: July 10, 2026

ROBBINS GELLER RUDMAN
& DOWD LLP
KEVIN A. LAVELLE (admitted *pro hac vice*)
klavelle@rgrdlaw.com
TING H. LIU (admitted *pro hac vice*)
tliu@rgrdlaw.com

s/ Ting H. Liu
TING H. LIU

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058

Lead Counsel for Lead Plaintiffs

KELLER ROHRBACK L.L.P.
KEIL M. MUELLER, OSB No. 085535
kmueller@kellerrohrback.com
601 SW Second Avenue, Suite 1900
Portland, OR 97204
Telephone: 971/253-4600

Local Counsel